**CITY OF COLUMBIA, Tennessee,
Petitioner,**

v.

**C.F.W. CONSTRUCTION CO. and Sher-
man Concrete Pipe Co., Respondents.**

Supreme Court of Tennessee.

Nov. 25, 1977.

Cain & Moore, Columbia, for petitioner.

MacFarland, Colley, Blank & Jack, Columbia, Howser, Thomas, Summers, Binkley & Archer, Nashville, for respondents.

## OPINION

BROCK, Justice.

Plaintiff, City of Columbia, sues the defendants, C.F.W. Construction Company, a general contractor, and Sherman Concrete Pipe Company, a pipe manufacturer, for specific performance or, in the alternative, for damages alleging deficiencies in performance of a sewer construction contract. Right to relief was based both upon the original construction contract and a later executed guaranty agreement. At the close of plaintiff's proof the Chancellor granted defendants' motion for dismissal of the action. Holding that the subsequently executed guaranty agreement superseded the original construction contract and that the City had failed to offer evidence of a right to relief under the guaranty in that it had not identified specific defects of construction of the sewer line, the Court of Appeals affirmed the trial court. We granted certiorari.

I

In October, 1960, the City of Columbia (City) and C.F.W. Construction Company (CFW) entered into a contract whereby CFW agreed to construct certain sanitary sewer improvements for the City in accordance with plans and specifications prepared by consulting engineers, Zimmerman, Evans and Leopold (Engineer). The contract, together with an addendum, specified the use of reinforced concrete pipe for a portion of the sewer line, to be joined with flexible rubber-joint gaskets in order to obtain water-tight conditions and to allow for settling of the pipes. The specifications called for leakage and infiltration tests:

"The maximum allowable infiltration into the sewer lines shall be limited to 10,000 gallons per 24 hours per mile of sewer. This clause does not relieve the contractor of the necessity of making the sewers as tight as possible. Sewers which exceed this limit will not be accepted and the contractor shall take such steps as are necessary to bring the infiltration within the above allowance. * * * The test shall be made following a period of heavy rain and when the ground is saturated." (Contract, T4–09(D).)

Before completion of the project, excessive leakage at the pipe joints prompted

CFW to undertake repairs by sealing the leaking joints with a cement mortar, although this procedure was not in accordance with contract specifications. Infiltration tests conducted subsequent to the repairs on this segment of the construction indicated 153% and 143% of the maximum allowable infiltration rate. Because of the deviation from contract requirements and the Engineer's consequent apprehension that defects might eventually appear in the sewer line with the settling of the pipes and consequent cracking of the rigid joints created by the mortar repair, the City ultimately refused to accept the segment of the project between manholes J–32 and J–1.

In order to induce the City to accept and pay for the work, CFW and the pipe manufacturer and supplier, Sherman Concrete Pipe Company (Sherman Pipe) entered into a guaranty agreement with the City in March, 1962.

Pertinent provisions of the guaranty agreement are as follows:

"The said C.F.W. Construction Company has laid or installed a sewer line improvement for the City of Columbia, Tennessee, under and pursuant to a contract . . . which contract is hereby incorporated into this agreement by reference.

\* \* \* \* \* \*

"In order to induce the owner to accept said portion of sewer line work and to pay for same in accordance with the contract hereinabove referred to . . . the undersigned supplier and contractor . . . obligate . . . themselves . . . to repair and correct any and all defects arising from defective workmanship and materials that may be found in said portion of said sewer line in question within a period of ten (10) years, including the replacement of portions of said line when necessary; said ten year period to begin at the expiration date of the one year guaranty provided under Paragraph GC–12 of said contract hereinabove referred to.

"Without limiting the generality of the foregoing guaranty provision, the undersigned agree that during this ten year period:

"1. That Paragraph GC–12 of said contract is hereby extended for an additional ten year period insofar as it relates to that portion of the sewer line described above.

"2. That said Engineer, its successors or assigns, shall determine when there has been a defect in said portion of the sewer line. Upon notification by said Engineer or the City of Columbia, the undersigned shall within a reasonable time undertake the necessary repair and corrective measures, including the replacement of any portion of said sewer line that in the judgment of the Engineer requires replacement.

"3. . . . In general, Paragraph GC–31 of said contract shall govern the corrective or replacement work if the need arises.

"4. The undersigned agree to pay for all damages caused by any defects determine¹ to result from the unfitness and unsoun¹ness of the portion of said line hereinabove referred to, including damages to other work resulting therefrom.

\* \* \* \* \* \*

"6. The undersigned agree to pay all expenses, including engineer's fees and costs of plans and specifications incurred because of work required under this contract and guaranty.

\* \* \* \* \* \*

"8. The Supplier and Contractor shall pay for all damages resulting from their failure to make the necessary repairs promptly after notice from the city or from said engineer that a defect has occurred.

"9. The said contract herein made a part of this agreement shall, where applicable, apply to any replacement work called for by reason of this agreement.

\* \* \* .\* \* \*

"11. The City of Columbia by accepting this guaranty does not waive its rights under Paragraph GC–12 of said contract.

\* \* \* \* \* \*

"The City of Columbia shall be deemed to have accepted this guaranty when pay-

ment is made of the balance due under said contract." (Underscoring added.)

A guaranty bond required by the guaranty was executed by a corporate surety and remained in effect for the first five years of the guaranty. Simultaneous with the guaranty agreement, CFW and Sherman Pipe entered into an agreement between themselves to share equally any obligations under the Guaranty with the City.

Thereafter, on August 20, 1962, the City accepted the construction and paid the balance owed under the contract.

Paragraph GC–12 of the original contract, extended for an additional ten years by the guaranty, provides as follows:

"GC–12. *GUARANTEE: CORREC-TION OF THE WORK:*

For a period of at least one year after the completion of the Contract, the Contractor warrants the fitness and soundness of all work done and materials and equipment put in place under the Contract. Neither the final certificate of payment nor any provision in the contract documents or entire occupancy of the premises by the Owner shall constitute an acceptance of work not done in accordance with contract documents or relieve the Contractor of liability for faulty materials or workmanship. The Contractor shall remedy any defects in the work and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final acceptance unless a longer period is specified. The Owner shall give notice of observed defects with reasonable promptness."

Subsequent to the City's acceptance of the entire sewer construction project the Engineer conducted three (3) infiltration tests of the sewer line:

(1)

A test conducted May 12, 1966, determined that the adjusted infiltration rate was 189,000 gallons per day as compared with the permissible maximum specified in the contract of 20,350 gallons per day.

Shortly thereafter, the City advised CFW and Sherman Pipe of the Engineer's finding of excessive infiltration and gave "official notice to the parties concerned to discharge the obligation required by the Guaranty and Guaranty Bond."

CFW inspected the pipes and "found the line to be in excellent general appearance and . . . only located approximately six leaks," and that the leaks did "not appear to be at each joint, but . . . in isolated locations . . .." CFW proposed "encasing the leaks from the outside with concrete one by one" and, in the event such repairs failed, proposed to conduct a television inspection and further repairs with Penetryn.

The Engineer objected to the absence of flood conditions when the CFW inspection was conducted but approved the method of repair proposed if CFW understood "that if the infiltration rate, after the corrective work has been performed, still exceeds the contract allowable rate, (CFW) will employ other means of locating and correcting the excess leakage," and, provided the infiltration tests were performed during wet weather conditions. These conditions and requirements were formally approved and accepted by CFW and Sherman Pipe.

CFW undertook repair of the pipes but closer inspection revealed that none of the six previously discovered "leaks" was the result of its defective work but resulted either from improper or faulty sewer connections which had been tapped onto the top of the sewer line by third parties after it had been constructed or were not actually leaks at all.

The City, however, believed that the proportion of infiltration attributable to the faulty service connections was insignificant in proportion to the excessive infiltration rate, nine times the permissible maximum, and, a year later, requested CFW to proceed with alternate repair methods.

CFW insisted, however, that it "still (did) not have enough factors upon which to make a final determination.," and the City proceeded to have the Engineer appraise the existing pipe line.

### (2)

A test conducted June 23, 1970, determined that the infiltration rate was 712,576 gallons per day. This figure was later corrected to allow for a section of cracked pipe caused by road construction resulting in an adjusted figure of 537,576 gallons per day (26 times permissible maximum).

In a letter setting forth the results of its appraisal the Engineer stated:

"Based on these tests, it is our recommendation that the City of Columbia take immediate recourse against the Contractor and Supplier, using the steps outlined in this Guaranty. The obligated parties should be instructed to take prompt action to reduce the infiltration in this sewer line to the amount stipulated as acceptable in the specifications."

The City transmitted a copy of the Engineer's report to CFW and Sherman Pipe, requesting immediate action to comply with the contract.

CFW then carried out an extensive film investigation of the pipes in August and September of 1970, taking 1800 different pictures at six foot intervals throughout the segment of the pipe under dispute. These pictures showed all connections into the sewer line and all structural defects, other than gasket joints which could not be seen in the internal pipe pictures. The pictures did not demonstrate any defects of joints but did reveal cracked clay pipes which resulted from the City's road construction and also identified the previously located service connections.

### (3)

A test conducted March 31, 1971, with representatives of both the City and CFW present, determined that the adjusted infiltration rate was 495,500 gallons per day (25 times maximum).

In this test all service connectors were plugged and corrections made for the non-construction defects identified by CFW's film investigation.

The Engineer again urged:

"To prevent further financial loss, the City should take immediate action to have the Contractor fulfill the terms of his Guaranty and Guaranty Bond Agreement. The Contractor should be required to use methods satisfactory to the City of Columbia and reduce the infiltration so that it will not exceed the allowable limits."

Thereafter, on April 10, 1972, the City filed suit against CFW and Sherman Pipe alleging breach of the original contract and breach of the guaranty. Defendants filed a joint answer denying liability under the contract and the guaranty agreement.

During the course of the trial, H. F. Zimmerman, who was qualified as an expert, responded to a hypothetical question that it was his opinion the inflexible joint sealer had cracked and that this was the reason for the excessive infiltration.

Another expert, Larry D. Sherer, testified, "I feel . . . excessive infiltration . . . is primarily caused by leaking joints." The Chancellor sustained the objection of defendant's counsel that Mr. Sherer's response was "the ultimate question in this lawsuit and there was no evidence that he examined any joints or found any leaking joints. All he did was an infiltration test."

At the close of plaintiff's proof the Chancellor granted the defendants' "motion for a directed verdict," but failed to make findings of fact. The Court of Appeals affirmed, holding that the subsequently executed guaranty agreement superseded the original contract and that the City had failed to identify specific defects of construction in the sewer line which entitle it to relief under the guaranty.

We granted certiorari review.

### II

Although reaching contrary conclusions, both parties assert that the central question presented is whether the City is entitled to rely upon both the construction contract and the guaranty agreement, or, is limited to the provisions of the guaranty.

■ This issue is essentially one of ascertaining the intent of the parties. The evidence of intent is to be found in the language used by the parties in the guaranty agreement, considered in the light of their respective interests and other relevant circumstances existing at the time the guaranty was executed, and in the practical construction given to it by the parties, as disclosed by their actions subsequent to its execution.

■ In our opinion neither the insistence of plaintiff nor that of the defendants is wholly correct; some, but not all, rights and obligations of the original contract are continued by the guaranty agreement. Thus, the guaranty provides that section GC–12 of the original contract is "extended for an additional ten year period insofar as it relates to that portion of the sewer line described above (between manholes J–32 and J–1)"; and, that "[t]he City of Columbia by accepting this guaranty does not waive its rights under Paragraph GC–12 of said contract."

The sense of the guaranty agreement is that the City, having refused, upon reasonable grounds, to accept that portion of the line between manholes J–32 and J–1 "because of its apprehension that defects [might] appear in said portion of the sewer line because of unfitness or unsoundness," agreed to accept the disputed line and pay the contractor as scheduled in the original contract in consideration of the execution by the defendants of the guaranty agreement. The City gave up its rights as they existed under the original contract in exchange for the guaranty agreement with its provisions for a ten year warranty, a corporate bond of five years' duration and the addition of Sherman Pipe Co. as a "guarantor" or warrantor. Therefore, we are of the opinion that the guaranty agreement constitutes an accord and satisfaction of the original construction contract and, thus, constitutes a discharge of its obligations. See *Restatement of Contracts,* §§ 418, 419. Accordingly, the rights and duties of the parties are to be determined in accordance with the provisions of the guaranty agreement. The principal contractual provisions are (1) the warranty clause of paragraph GC–12 of the original contract, brought forward by the guaranty, to-wit:

" . . . the contractor warrants the fitness and soundness of all work done and materials and equipment put in place under the contract. . . . "

and (2) the following provisions of the guaranty agreement:

" . . . Supplier and contractor [agree] to repair and correct any and all <u>defects arising from defective workmanship and materials</u> that may be found in said portion of said sewer line . . . within a period of ten (10) years, . . . .

\* \* \* \* \* \*

"The undersigned agree to pay for all damages caused by <u>any defects</u> determined to result from <u>the unfitness and unsoundness</u> of the portion of said line. . . . " (Underscoring added.)

### III

As noted above, the Chancellor at the conclusion of plaintiff's evidence granted the motion of defendants "for a directed verdict," although this case was tried without a jury. Rule 41.02(2), Tennessee Rules of Civil Procedure, provides:

"After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence; in the event judgment is rendered at the close of plaintiff's evidence the court shall make findings of fact if requested in writing

within three days after the announcement of the court's decision."[1]

■ The motion authorized by this rule is not to be confused with a motion for directed verdict which is authorized by Rule 50, Tennessee Rules of Civil Procedure. Motions for a directed verdict are neither necessary nor proper in a case which is being tried without a jury. Motions for dismissal in non-jury cases under Rule 41.-02(2), Tennessee Rules of Civil Procedure, and motions for directed verdicts in jury cases under Rule 50, Tennessee Rules of Civil Procedure, are somewhat similar, but, there is a fundamental difference between the two motions, in that, in the jury case, the judge is not the trier of facts while in the non-jury case he is the trier of the facts. In the jury case he must consider the evidence most favorably for the plaintiff, allow all reasonable inferences in plaintiff's favor and disregard all counteracting evidence, and, so considered, if there is any material evidence to support a verdict for plaintiff, he must deny the motion. But in the non-jury case, when a motion to dismiss is made at the close of plaintiff's case under Rule 41.02(2), the trial judge must impartially weigh and evaluate the evidence in the same manner as though he were making findings of fact at the conclusion of all of the evidence for both parties, determine the facts of the case, apply the law to those facts, and, if the plaintiff's case has not been made out by a preponderance of the evidence, a judgment may be rendered against the plaintiff on the merits, or, the trial judge, in his discretion, may decline to render judgment until the close of all the evidence. The action should be dismissed if on the facts found and the applicable law the plaintiff has shown no right to relief.

■ Upon appeal from a judgment granting such a motion to dismiss the Court of Appeals must review the evidence according to the rules established by T.C.A., §§ 27–113 and 27–303, and, this Court, in reviewing the action of the Court of Appeals in such a case, must do so according to

the dictates of T.C.A., §§ 27–113 and 27–304. Thus, to the extent that the findings of fact of the trial judge and the Court of Appeals concur, they shall be conclusive upon this Court if there be any evidence to support them. But, to the extent that the findings of the trial judge and of the Court of Appeals do not concur, the facts are open to a de novo examination in this Court with the presumption, however, that the judgment of the trial judge was correct unless the evidence preponderates against it. *Folk v. Folk,* 210 Tenn. 367, 355 S.W.2d 634 (1962); *Joest v. John A. Denie Sons Co.,* 174 Tenn. 410, 126 S.W.2d 312 (1939). And, in cases such as the instant one, in which the trial judge has failed to make specific findings, although a particular finding might be considered to be implicit in his holding, this Court is not bound by the concurrent finding of fact rule on the theory that the trial judge and Court of Appeals have made concurrent findings; in such situations this Court will review the record with a view to determine where the preponderance of the evidence lies with respect to the issue of fact in question. *Kemp v. Thurmond,* Tenn., 521 S.W.2d 806 (1975). It is by this standard that we have reviewed the evidence in this case.

■ The question is whether a preponderance of the evidence supports a finding of "unfitness and unsoundness" of the sewer line due to "defects arising from defective workmanship and materials." We hold that it does.

■ Of course, "[a]ny fact may be proved by direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence." *Scott v. Atkins,* 44 Tenn. App. 353, 314 S.W.2d 52 (1957). Circumstantial evidence "consists of proof of collateral facts and circumstances from which the existence of the main fact may be deduced according to reason and common experience of mankind." *Webb v. State,* 140 Tenn. 205, 203 S.W. 955 (1918). The results of infiltration tests, properly performed, may demonstrate infiltration into a sewer

---

1. This rule is patterned after Rule 41(b) of the Federal Rules of Civil Procedure. We thus have the benefit of the experience of the Federal courts in interpretation of the Federal rule.

line. See *City of Hillsboro v. James and Yost, Inc.,* 240 Or. 433, 402 P.2d 511 (1965).

Although the maximum permissible infiltration rate specified in the original contract applied to field tests of the sewer line performed *before* the plaintiff's acceptance of the work, such figure adequately represents a mutually agreed tolerance of reasonable deviation from absolutely watertight sewer construction. Infiltration at a greater rate may be fairly considered to be a defect within the meaning of the guaranty agreement, provided it results from defective materials or workmanship. This was implicitly recognized by the Court of Appeals which stated:

> "Ordinarily, evidence that the efficiency of a sewer pipe had deteriorated by a multiple of 25 or 35 within eight years would present a prima facie inference of defective materials or workmanship in its construction."

The Court of Appeals held, however, that certain leaks not attributable to the defendants "negative any prima facie inference of structural defect arising from the excessive infiltration. . . ."

We cannot agree. Our examination of the record discloses that at least the third infiltration test specifically accounted for and excluded the non-construction caused leaks identified by CFW. Hence, such leaks cannot negative the inference of structural defects arising from the fact of grossly excessive infiltration.

In conducting the 1966 infiltration test, revealing nine times the permissible infiltration rate, the Engineer plugged "[a]ll known tributary sewers" but CFW's subsequent investigation revealed four unauthorized service connections not accounted for by the testing procedure.

The 1970 test took into consideration the sources of external water identified by CFW and initially resulted in an infiltration rate of 35 times the allowable rate. CFW's subsequent film investigation revealed cracked clay pipes resulting from highway construction in one segment of the line. Mathematical corrections of the infiltration rate for this segment were made, resulting in a rate of 26 times permissible maximum.

Finally, the comprehensive 1971 test of the line, at which representatives of both the City and CFW were present, took into account all known and identified sources of external water and defects in the line that were not the result of the contractor's construction and resulted in an infiltration rate 25 times permissible maximum.

Together with proof that the joints of the sewer pipes were not properly fitted or sealed and that this may have allowed for infiltration, the corrected second infiltration test, the comprehensive third test and the expert opinion that the excessive infiltration took place at the joints constituted a preponderance of evidence to establish a case of defective construction. Of course, ultimately, such evidence may be overcome by the defendants' proof. But the general rule is that "it is sufficient, in a civil case depending on circumstantial evidence, for the party having the burden of proof to make out the more probable hypothesis and the evidence need not rise to that degree of certainty which will exclude every other reasonable conclusion." *Bryan v. Aetna Life Insurance Co.,* 174 Tenn. 602, 130 S.W.2d 85 (1939).

We conclude, therefore, that the Chancellor and the Court of Appeals erred in dismissing the action and that the cause must be remanded to the trial court for a new trial.

## IV

One other issue remains. Two witnesses qualified as experts and testified that, in their opinion, excessive infiltration into the sewer lines was due to defects of construction. Although one expert witness responded in answer to a hypothetical question, the Chancellor disallowed the testimony of the other expert witness because his response went to "the ultimate question in this lawsuit and there was no evidence that he examined any joints or found any leaking joints. All he did was an infiltration test."

In *National Life & Accident Insurance Co. v. Follett,* 168 Tenn. 647, 80 S.W.2d 92 (1935), this Court determined that where expert information is necessary for intelligent decision of an ultimate issue it does

not matter that the opinion and one solution to the ultimate issue coincide. It is only when the trier of fact is as competent as the expert to determine an issue that the opinion of an expert has been held to be inadmissible, because unnecessary. See D. Paine, *Tennessee Law of Evidence* § 177 (1974). Moreover, in our view the better rule is that an expert's opinion is not objectionable merely because it embraces an ultimate issue to be decided by the trier of facts, so long as it is helpful to the court. See *Federal Rules of Evidence,* Rule 704. Accordingly, we conclude that it was error for the Chancellor to exclude the testimony of the expert in this instance.

The decrees of the lower courts are reversed and this cause is remanded to the chancery court for further proceedings consistent with this opinion. Costs of this appeal will be borne by the defendants, C.F.W. Construction Company and Sherman Concrete Pipe Company.

COOPER, C. J., and FONES and HARBISON, JJ., concur.

HENRY, J., not participating.