**Lawrence S. WILSON, d/b/a Georgian Hills Shopping Center, Plaintiff/Appellee,**

v.

**KELLWOOD COMPANY, Defendant/Appellant.**

Court of Appeals of Tennessee, Western Section, at Jackson.

April 8, 1991.

Application for Permission to Appeal Denied by Supreme Court Sept. 3, 1991.

**314**

Beth Cocke of Friedman and Sissman, Memphis, for plaintiff/appellee.

John C. Speer and Monique Nassar of Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, for defendant/appellant.

TOMLIN, Presiding Judge, Western Section.

Lawrence S. Wilson, d/b/a Georgian Hills Shopping Center, ("plaintiff" or "Georgian Hills") filed suit in the Circuit Court of Shelby County against Kellwood Company ("Kellwood" or "defendant"), alleging that Kellwood was liable to plaintiff pursuant to a guaranty that had been executed by Kellwood in connection with a lease for commercial space involving a former subsidiary. The leased property was located in a shopping center purchased from the original lessor by plaintiff. The trial court granted partial summary judgment for plaintiff, holding that the guaranty executed by Kellwood in connection with the original lease was binding upon it as to an extension or renewal of the lease. At a subsequent trial the court awarded plaintiff a judgment for monetary damages based upon the default of plaintiff's tenant under the new lease.

Kellwood has raised five issues on appeal. It contends that the trial court erred in: (1) applying an improper standard for granting summary judgment and assuming facts not supported by the record; (2) determining that Kellwood was obligated under the guaranty for the obligations of the new tenant under the subsequent lease on the premises without notice to or the consent of Kellwood; (3) finding that plaintiff sustained any damages inasmuch as it had performed all obligations under the original lease; (4) awarding future rents as damages; and (5) making an improper determination as to the amount of attorney fees. Our disposition of the first two issues is dispositive of this case. We accordingly pretermit the last three issues. For the reasons hereafter stated, the judgment of the court below is reversed.

We will consider only those facts that relate to the first two issues on appeal. On April 23, 1982, plaintiff's predecessor, Georgian Hills, as a limited partnership, entered into a lease agreement with Ashley's the Outlet Store, Inc. ("old Ashley's") as tenant. The old Ashley's was a wholly-owned subsidiary of Kellwood. The lease was for a five-year term and expired June 30, 1987. Joseph P. Collins signed the lease for the old Ashley's as its president.

As part of the same transaction, by a separate document entitled "Guarantee"

[sic ("Guaranty")], Kellwood undertook to guarantee the performance of the terms and conditions of old Ashley's obligations to Georgian Hills. The guaranty was spelled out in one paragraph, which read as follows:

> In consideration of LANDLORD entering into this lease, and to induce it to do so, KELLWOOD COMPANY, "Guarantor", hereby unconditionally guarantees the full and prompt performance when due of all the agreements, obligations and covenants imposed on TENANT, without requiring LANDLORD to proceed against TENANT or against any security LANDLORD may have. Guarantor hereby waives notice of acceptance hereof, and of all notices and demands of any kind to which it may be entitled. Guarantor further waives notice of and consents to any compromise or release by LANDLORD or by operation of law or otherwise of any rights against TENANT, and any extensions of time for payment or performance granted to TENANT or any other obligors of the lease. This is a continuing guaranty. Nothing shall discharge or satisfy Guarantor's liability hereunder except the full performance and payment of TENANT'S obligations under this lease. If Guarantor defaults on any of its obligations hereunder, it agrees to pay all costs and expenses of enforcing this guaranty, including reasonable attorney fees.

The lease was executed on behalf of Kellwood by Joseph P. Collins, Vice President, on April 21, 1982. It provided in part that the monthly rental for the five-year term was to be $2,625, as against four percent of annual sales in excess of $787,500. The lease also provided that "all covenants, conditions, agreements and undertakings ... shall extend to and be binding on the respective heirs, executors, administrators, successors and assigns of the respective parties hereto...." The lease contained no provisions for an option on the part of tenant to renew or extend the lease.

On February 25, 1986, Kellwood, by letter from a member of its legal department, advised Georgian Hills, the lessor under the 1982 lease, that the old Ashley's had sold all of its assets, including its corporate name, to Fifth Avenue Acquisition Company. The letter sought the consent of Georgian Hills to the assignment of the April 23, 1982 lease to Fifth Avenue. The letter also stated: *"The current management and employees of [old] Ashley's will remain with management participating in the ownership of the new company."* (emphasis supplied) Kellwood enclosed with the letter a consent form, along with an executed assignment of the lease and acceptance by the assignee. Joseph P. Collins executed the acceptance for Fifth Avenue as its president. This was consistent with the advice Kellwood gave in its cover letter to Georgian Hills.

In late December, 1986, plaintiff purchased the leased property from Georgian Hills. No one at Kellwood was notified of the change in ownership.

On or about January 21, 1987, approximately six months prior to the termination of the original lease, plaintiff, as the new owner of Georgian Hills, entered into a letter agreement with the new Ashley's. According to the terms of the agreement, new Ashley's was to lease the property from plaintiff for a period of five years beginning July 1, 1987, and extending to June 30, 1992. The new lease agreement increased the monthly rental from $2,625 to $3,000 per month for the first two years, and to $3,375 per month for the three remaining years. The excess rent was still computed at the four-percent rate. However, the minimum sales figures for the first two years were pegged at $900,000, and for the last three years, $1,012,500. The agreement provided that all other terms and conditions of the original lease were to remain the same. The letter agreement was signed by Joseph P. Collins on behalf of the new Ashley's. No notification of the lease's "extension" was given to Kellwood by either plaintiff or new Ashley's.

By letter dated May 22, 1987 Kellwood, through its assistant general counsel, Pollihan, wrote Leonard Lurie, the leasing-managing agent for Georgian Hills, advising him that according to defendant's records,

the then-existing lease would expire on June 30, 1987. Defendant further advised that "any renewals or extensions of present leases will be directly between you and the new Ashley's; so that Kellwood and the old Ashley's will have no liability whatsoever, whether under a guaranty or under the lease." It appears that this letter was a form letter sent to the landlords of all the old Ashley's.

Following the new Ashley's default in making payments under the new lease agreement, plaintiff, through his counsel, made demands for performance by defendant under the terms of its guaranty executed in connection with the prior lease. Following the denial of liability by defendant, this suit ensued.

## I. PLAINTIFF'S SUMMARY JUDGMENT MOTION

Shortly after filing its complaint, plaintiff filed a motion for summary judgment, asserting that no genuine issue of material fact existed between the parties. In support of its motion, it filed an affidavit of Leonard Lurie. Lurie's affidavit stated in substance that in the negotiations and execution of both the original lease and the lease extension with Ashley's and Fifth Avenue, he always dealt with the same people; namely, J.P. Collins, Thomas Pollihan, and Jim Sweeney. Lurie's affidavit went on to say in part:

> These people assured me, and I relied on their assurances, that the sale of assets would not affect the Lessor in any way because the same management was involved, the name of the store was the same, its function never changed, and, of course, its location remained the same.
>
> No one told me at any time prior to execution of the lease extension that Kellwood would not remain as guarantor of the tenant's performance under the lease.

In response to plaintiff's summary judgment motion and in support of its own Motion for Summary Judgment, Kellwood filed the affidavit of Thomas H. Pollihan, its assistant general counsel. Pollihan's affidavit reads as follows:

I, THOMAS H. POLLIHAN, having been first duly sworn, state that I am a resident of the State of Missouri; that I am Assistant General Counsel for Kellwood Company; that I have personal knowledge of the following facts: that from and after February 25, 1986, Kellwood Company has had no ownership interest in the "Ashley's" store operations, or in Fifth Avenue Acquisition Company or in Ashley's Outlet Stores, Inc.; that from and after February 25, 1986, Joseph P. Collins ceased being an employee and an officer of Kellwood Company; that the five year lease (Exhibit A to plaintiff's memorandum) between plaintiff and Ashley's The Outlet Store, Inc. which was signed on April 23, 1982 provided for a termination date of June 30, 1987 and did not provide for any renewals; that prior to that termination date and the commencement of the lease extension, the landlord's leasing agent, Leonard Lurie, received my letter dated May 22, 1987 (Exhibit E to plaintiff's memorandum) which recited that the lease term expired June 30, 1987 and that Kellwood Company would not be liable under its guaranty for any renewals or extensions of that lease; that Kellwood Company received no response whatsoever to this letter of May 22, 1987; that the first knowledge Kellwood ever received that the lease was extended came when plaintiff's lawyers wrote me months later in September, 1987; that Kellwood was never furnished with a copy of the extension until January, 1988; that the rent during the extension term was greater than the rent under the original lease; that Kellwood has consistently denied liability under the guaranty for any obligations arising from and after June 30, 1987; that Kellwood has met all guaranty obligations up through June 30, 1987; that the only assurances given to Leonard Lurie by me were contained in my letter of February 25, 1986 which is attached to this Affidavit as Exhibit "A", (and which plaintiff admits receiving in its Memorandum); that these assurances were specifically limited to "this lease" which terminated June 30, 1987; that the

plaintiff was put on notice by my February 25, 1986 letter that Kellwood had sold the Ashley's operation and that the then current management and employees of Ashley's (which included J.P. Collins and Jim Sweeney) would all go with the new company, so that any assurances Leonard Lurie claims to have received from Collins or Sweeney can not be relied upon to bind Kellwood Company; and that Kellwood Company has no knowledge of any such assurances being made to Leonard Lurie. FURTHER AFFIANT SAITH NOT.

Following a hearing on the respective motions, the trial court issued its opinion by letter, which was subsequently incorporated into an order. It reads in pertinent part as follows:

> The Court finds, on the undisputed facts, that Joseph P. Collins, who signed the original Guarantee on April 21, 1982, was also a party to the Assignment of Lease dated February 25, 1986, and the letter extending the lease dated January 21, 1987. The Court further finds that Collins, and through him, Kellwood, knew of the existence of the Guarantee when the extension was executed and had ample opportunity to make known its intent to revoke the Guarantee prior to the execution of the extension. The Court finds that the May 22, 1987, letter of revocation came too late. Therefore, Plaintiff's Motion for Summary Judgment is hereby granted. Defendant's Motion to Dismiss or in the Alternative for Summary Judgment is hereby denied.

Kellwood timely filed its Motion to Reconsider the order of summary judgment, pointing out to the trial court that in making its findings of fact it obviously overlooked the previously-filed affidavit of Thomas Pollihan. In overruling the defendant's motion to reconsider, the court stated from the bench: "I've looked at the affidavit, and considering everything, I still think that it's not crystal clear that they had disassociated themselves with the company and that this was knowledge that was available to the plaintiff. I'm going to reaffirm my decision."

In ruling on a motion for summary judgment, the appellate courts, like the trial courts, must review the matter in the light most favorable toward the non-moving party and draw all legitimate conclusions of fact in his favor. *Daniels v. White Consolidated Industries, Inc.*, 692 S.W.2d 422 (Tenn.App.1985). Furthermore, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the United States Supreme Court clarified the standard required for obtaining a summary judgment when it stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322, 106 S.Ct. at 2552. The courts of this state have since followed the United States Supreme Court in *Celotex*. *See Stanley v. Joslin*, 757 S.W.2d 328, 330 (Tenn.App.1987); *Moman v. Walden*, 719 S.W.2d 531, 533 (Tenn.App.1986).

At the time the plaintiff's Motion for Summary Judgment was considered, the court had before it in the way of facts the affidavits of Pollihan and Lurie. The trial court seemed to be caught up with the execution of multiple documents by Joseph P. Collins. The important fact is not that Collins executed these various documents, but the capacity in which Collins was acting when he executed them. Pollihan's affidavit stands uncontradicted that from and after February 25, 1986, Kellwood had no ownership interest in the Ashley's store operations, nor after that time was Joseph Collins an officer or employee of Kellwood. Further, that as of the same date, the then-current management of old Ashley's, including Collins and Jim Sweeney, became associated with the new Ashley's.

An examination of the affidavit of Leonard Lurie reveals that it does not in any way contradict the statement of facts made by Pollihan of his own personal knowledge on behalf of Kellwood.

While the court had before it the obvious fact that Collins executed the assignment of lease dated February 25, 1986 and the letter extension of the lease dated January 21, 1987, he did so not as an officer of Kellwood and the old Ashley's, but as an officer of the new Ashley's, which was in no way associated with Kellwood. Considering these facts in the light most favorable to Kellwood, we find it was error for the trial court to grant summary judgment for plaintiff on the basis of imputed knowledge to Kellwood through Collins based upon a relationship that did not exist.

Following the hearing on damages, the trial court was in error in making the findings of fact and conclusions of law regarding Collins' relationship with Kellwood. The uncontradicted testimony of Pollihan at the hearing corroborated and substantiated his earlier affidavit to the effect that from and after February 25, 1986, Kellwood had divested itself of any and all interests in the old Ashley's, and further, that Collins was no longer associated as an officer or employee of Kellwood. There was no justification for finding liability to plaintiff on the part of Kellwood based upon any relationship between Joseph Collins and Kellwood, real or imputed.

## II. THE NATURE OF THE GUARANTEE

■ The basic issue is whether or not the Guarantee executed by Kellwood on April 21, 1982 was a continuing guaranty or a guaranty limited to the term of the lease in connection with which it was executed. We are called upon to make this construction within the framework of the law of this state. It has been held that guarantors are not favored under our law. *W.R. Grace & Co. v. Taylor*, 55 Tenn.App. 227, 398 S.W.2d 81 (1965). A guarantor in a commercial transaction is to be held to the full extent of his engagements, and the rule in construing such an instrument is that the words of the guaranty are to be taken as strongly against the guarantor as the sense will admit. *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801 (Tenn. 1975).

In ascertaining the intentions of the parties in seeking to determine whether a guaranty is a continuing one or a limited one, our Supreme Court in *City of Columbia v. CFW Construction Co.*, 557 S.W.2d 734, 739 (Tenn.1977), stated:

The evidence of intent is to be found in the language used by the parties in the guaranty agreement, considered in the light of their respective interests and other relevant circumstances existing at the time the guaranty was executed, and in the practical construction given to it by the parties, as disclosed by their actions subsequent to its execution.

In 38 C.J.S., *Guaranty*, § 43, it is stated:

The nature and extent of the liability of a guarantor depends on the terms of his contract of guaranty, as construed by the general rules of construction.... the guarantor is entitled to stand on, and cannot be held liable beyond, the strict terms of his contract, even though a proposed alteration of the contract would be for his benefit; ...

In 38 C.J.S., *Guaranty*, § 50, pertaining to guaranties of leases, the following is found:

[A]lthough a guaranty provision in the original lease between the parties by its terms extends to renewals of the lease, the guarantor is not liable for a balance due under a subsequent lease separate and independent of, and containing terms different, from the first lease.

■ An examination of the facts in this record clearly indicates that in light of the analysis set forth in *City of Columbia, supra*, the guaranty in the case under consideration was intended by the parties thereto to be applicable to the original lease between Georgian Hills and the old Ashley's.

First of all, in the lease between Georgian Hills and the old Ashley's there is no mention of an option to renew or extend the lease. Second, although the Guarantee is called a "continuing guaranty," it provides that "nothing shall discharge or satisfy guarantor's liability hereunder except the full performance and payment of tenant's obligations under *this lease*." (Em-

phasis ours). Stated another way, the full performance by tenant (the old Ashley's) of its obligations under the lease—i.e., the five-year term—would satisfy the liability of Kellwood and discharge it as a guarantor. It is uncontested that as of July 1, 1987, the day following the end of the five-year term, the old Ashley's, as tenant, had met and performed all of its duties and obligations, thus bringing about the discharge of Kellwood as a guarantor.

In discussing the intent of the parties, the court in *City of Columbia, supra,* notes that an item to be reckoned with is the respective interests of the parties at the time the guaranty was executed. In the case at bar, at the time Kellwood executed the guaranty in question, the tenant whose obligations were being guaranteed (the old Ashley's) was a wholly-owned subsidiary of Kellwood. That relationship ceased in February, 1986 when Kellwood sold all of the assets of the old Ashley's, including the corporate name, to Fifth Avenue. Although Kellwood recognized its continuing obligations, even under the original lease, when it sought the consent of Georgian Hills to the assignment, at the same time it made it clear that its relationship with old Ashley's had been severed by the sale of the assets of the company.

The practical construction given to this guaranty by the parties also reflects that this was a limited guaranty, confined to the obligations of the original lease. At all times relevant to this transaction Leonard Lurie was the managing agent of Georgian Hills for both the original lessor and plaintiff. He was fully familiar with the Guarantee. The letter agreement setting forth the terms and provisions of the new lease between the new Ashley's and plaintiff was written on stationery of Lurie's company and was in fact signed by him. Nothing in the record indicates that Kellwood was provided a copy of this document at the time of its creation, or that Kellwood was advised of its existence at that time or any time thereafter until this controversy arose. Furthermore, when Lurie, as plaintiff's agent, was notified by Kellwood in May, 1987, (five months after Lurie wrote the letter agreement referred to above) just weeks before the new lease was to begin,

advising plaintiff that the guaranty would come to an end, along with the lease, no challenge or protest was made by Lurie on behalf of plaintiff.

Furthermore, plaintiff testified at trial below that when he purchased Georgian Hills Shopping Center in December, he did not notify Kellwood of his purchase of the center, nor did he at any time until after this controversy arose advise Kellwood that he was looking to it to guarantee the obligations of the new Ashley's on the "extended" lease.

Additionally, the subsequent lease on the premises substantially altered a major provision of the lease and would have considerably increased the obligation of Kellwood without its knowledge. We speak specifically of the rent the new Ashley's was obligated to pay Georgian Hills over the ensuing five years. A simple mathematical calculation reveals that over the five-year term, the new Ashley's committed itself to a twenty-two percent increase in rent above what it was obligated to pay under the original lease.

■ We think all the above clearly establishes that the guaranty of Kellwood was limited to the original lease. However, even if it might be construed as a continuing guaranty, there would be no obligation on Kellwood's part for the extension of its obligations relative to a transaction made without Kellwood's consent. In addition, there was a material alteration in the lease contract between landlord and tenant whereby the terms of the new lease were materially different than those of the original lease. *See Lakeshore Commercial Finance Corp. v. Drobac,* 107 Wis.2d 445, 319 N.W.2d 839 (1982); *Federal Deposit Insurance Corp. v. Manion,* 712 F.2d 295 (7th Cir.1983).

The proof is uncontradicted in this record that Joseph Collins, whom the trial court repeatedly considered and designated as Kellwood's agent throughout all these transactions, became disassociated with Kellwood when he became part of the management of the new Ashley's in February, 1986. Whatever knowledge or information he gained after that time was in no way communicated by implication to Kell-

wood by virtue of any employment relationship. In addition, there is no evidence of any direct communication of any of the relevant circumstances to Kellwood.

Kellwood's form letter of May, 1987 to those lessors who had leased commercial space to the old Ashley's, of which Georgian Hills, plaintiff's center, was one, did not tell them that any guaranty was being revoked. To the contrary, these lessors were simply being advised and reminded that the assets of the old Ashley's had been sold by Kellwood in February, 1986, that there was no longer any business relationship between Kellwood and the new Ashley's, and that whatever leasing arrangements were made after the termination of the then-existing lease would be strictly between the new lessors and the new Ashley's.

For all of the foregoing reasons, we hold that defendant is in no way liable to plaintiff under its guaranty of February 21, 1982. Accordingly, the judgment of the trial court is in all respects reversed and plaintiff's suit is dismissed. Costs in this cause are taxed to plaintiff, for which execution may issue if necessary.

CRAWFORD and HIGHERS, JJ., concur.