IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 2000 Session

# KNOXVILLE'S COMMUNITY DEVELOPMENT CORPORATION, v. WOODFAM INVESTMENTS, L.P.,

**Direct Appeal from the Chancery Court for Knox County**
**No. 136576-3     Hon. Sharon Bell, Chancellor**

FILED JULY 24, 2000

**No. E1999-02317-COA-R3-CV - Decided**

Plaintiff sued to reform or void release of deed restrictions on property owned by defendant. The Trial Court ruled plaintiff failed to establish a basis for relief by clear and convincing evidence. We affirm.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and CHARLES D. SUSANO, JR. J., joined.

G. Wendell Thomas Jr., Knoxville, for Plaintiff-Appellant, Knoxville Community Development Corporation.

James S. Tipton, Jr., and Thomas S. Scott, Jr., Knoxville, for Defendant-Appellee, Woodfam Investments, L.P..

## OPINION

Knoxville community Development Corporation (formerly known as Knoxville Housing Authority, and referred to herein as "KCDC") filed this action to reform or void a release of deed restrictions on property transferred by KCDC to Woodfam's predecessor. The Complaint alleges the language of the release relating to the Woodfam tract was "the result of a mutual mistake

between Regency (Woodfam's predecessor) and [KCDC]."

At trial, KCDC offered proof and rested its case and on motion pursuant to T.R.C.P. 41.01(2), the Chancellor dismissed KCDC's cause of action with prejudice, and held that KCDC "has not shown by clear and convincing evidence, that the release was obtained without [KCDC] board approval" and that KCDC also failed to show, by clear and convincing evidence, that there was any proof justifying reformation of the release by mutual or unilateral mistake.

When a motion to dismiss is made under T.R.C.P. 41.02(2), at the conclusion of the plaintiff's proof, the trial court must weigh the evidence as it would at the conclusion of all the proof and determine whether "the plaintiff's case has . . . been made out by a preponderance of the evidence." *City of Columbia v. C.F.W. Construction Co.*, 557 S.W.2d 734, 740 (Tenn. 1977). Our review is *de novo* upon the record of the Trial Court, and no presumption attaches to the Trial Court's conclusions of law. T.R.A.P. Rule 13(d). *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

In February of 1971, KCDC agreed to sell to Knoxville Housing Partnership certain land parcels in the area of Knoxville known as Mountain View Urban Renewal Project. At the time, Parcel 21 (the property at issue in this case) contained approximately 20 acres. The Contract referred to "Phase I" and "Phase II" of Parcel 21, and provided for different rights and obligations with respect to each phase. The Contract required that the development of Phase I occur within certain definite time periods, but provided that development of Phase II would occur "as soon after Deed as is practicable."

In February of 1973, KCDC deeded Parcel 21 to Knoxville Housing Partnership. The Deed contained several restrictions, including a restriction that "the grantee, its successors and assigns, shall never dispose of the unimproved property for profit."

In June 1976, Knoxville Housing Partnership conveyed Phase I of Parcel 21 to Regency Properties, Ltd., ("Regency"), an entity whose members included Pat Wood and his brothers. Regency constructed a development on Phase I which is now occupied by Sun Trust Bank. In 1977, after this development by Regency, KCDC filed a release that released Phase I from the Deed restrictions.

By deeds in 1976 and 1980, Pat Wood acquired Knoxville Housing Partnership's title to Phase II of Parcel 21, consisting of about 15 acres. In a condemnation action, the State of Tennessee took, by eminent domain, approximately 5 acres of Phase II, leaving Wood without about ten aces of undeveloped property.

On December 10, 1984, KCDC's Executive Director, Gregory Kern, and Pat Wood signed an "Affidavit". The Affidavit recited that "all terms and conditions of that certain Agreement dated February 16, 1973, executed by the Knoxville Housing Partnership and the Knoxville Housing Authority . . . have been fully satisfied and the Agreement is therefore of no further force and effect."

The Agreement referred to, set forth Knoxville Housing Partnership's duty to provide KCDC with construction plans and dates of the anticipated commencement and completion of all construction. When the Affidavit was signed, KCDC knew that Phase II of Parcel 21 remained undeveloped, and that no "dates of anticipated construction" and no "construction plans" had ever been provided as specifically required by the February 16, 1973 Agreement.

On August 1, 1986, Pat Wood deeded the ten undeveloped acres remaining in Phase II to Woodfam, whose partners included Mr. Wood and members of his family.

In 1991, Wood learned that his brothers, who then owned Regency, were refinancing the five acre Regency property. Although KCDC had filed a release from the conveyance restriction in 1977 for those five acres, the prospective lender's title insurance company required another release. After learning that a new release on Parcel I was required, Pat Wood contacted Regency's attorney and asked him to include in the Release Phase II of Parcel 21, including the Woodfam Tract.

The Release was signed by William W. Baxter, Chairman of KCDC's Board of Commissioners, on December 31, 1991, and recorded that day in the Office of the Register of Deeds for Knox County. Baxter testified that he had no memory of signing the Release, but did recognize his signature as authentic. He stated that it was his "firm opinion and belief" that he would not have signed the Release had it not been under the authority of either senior staff or counsel for KCDC or the recommendation from them to sign. Baxter had been a practicing attorney as well as a businessman, and testified that when he signed the Release, he knew what a release was, what restrictions, covenants and conditions in deeds were, and knew that his signing a release of deed restrictions was a "significant thing to do." Baxter's signature on the Release was notarized by Mr. Shanks.

There is a presumption that a writing expresses the intention and understanding of the parties. *Davidson v. Greer*, 35 Tenn. 384 (Tenn. 1855). *Kyle v. Kyle*, 74 S.W.2d 1065 (Tenn. Ct. App. 1934). However, written contracts and instruments may be reformed upon a showing of a mutual mistake or fraud. *Pierce v. Flynn*, 656 S.W.2d 42, 46 (Tenn. Ct. App. 1983). To be subject to correction, the mistake in the instrument must have been mutual or there must have been a mistake of one party influenced by the fraud of the other. *Id.* In order to reform an instrument based upon mutual mistake, evidence must be clear , cogent and convincing. *Rentenbach Engineering Co. v. General Realty Lt.,* 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985).

KCDC argues that the execution, delivery and recording of the part of the Release that applies to the Woodfam Property was the result of a mutual mistake, and that the true intention of Mr. Baxter was to release only the Regency Property from the covenants and restrictions.

A "mutual mistake" is necessarily one where both parties were in error regarding some material fact. However, KCDC alleges nothing in its complaints regarding a mistake on the part of Woodfam. Not only did KCDC fail to set forth their claim of mutual mistake in their complaint, they also failed to produce any proof that Woodfam or its agents entered into the contract

-3-

based upon such mistake. KCDC attempts to base its arguments on the fact that Wood acknowledged that the Woodfam tract could not be disposed of for profit while undeveloped, and admitted that the Woodfam Tract had not been developed. This is not evidence that Wood was mistaken about the Release or intended anything other than what was written on the face of the Release. However, it does provide Wood with a motive for seeking the release from KCDC.

Wood's testimony that Woodfam intended for the Release to apply to all of KCDC's rights in Parcel 21 is uncontradicted.

Alternatively, KCDC argues that the Release should be reformed because of a unilateral mistake, citing 76 C.J.S. Reformation of Instruments §28(c) to say that "even a unilateral mistake is grounds for reformation of an instrument when the person who profits from the unreformed instrument has given no consideration for what it received." KCDC did not allege unilateral mistake in their Complaint or in any of their subsequent amended complaints, but did raise the issue before the Trial Judge. The Court ruled, however, that because there was an avowed statement of consideration, there could be no relief for unilateral mistake.

KCDC's witness, Tiller, senior vice-president and director of redevelopment, testified that the meaning of the Release is clear on its face, plainly stating that it releases all of KCDC's rights in all of Parcel 21. While KCDC alleges that Baxter believed that the Release only applied to the Regency property and that he did not intend to release the Woodfam Property from the restrictions and covenants, KCDC failed to offer proof of such beliefs and intentions. Instead, Baxter testified he had no recollection of any of the events surrounding the Release. When asked if he thought it would make a difference to him in his review whether the Release applied to the whole tract or just that being released, he said he had no idea and did not remember this being an issue at the time.

None of the parties involved had any recollection of the events surrounding the execution of the Release. It is undisputed that Baxter signed the Release and that Shanks notarized the signature, and that it was duly recorded. It is clear on the face of the Release that it applied to all the property in Parcel 21.

KCDC argues that the ultimate decision to release property from a development restriction must be made by KCDC's Board of Commissioners. They submit that in order to obtain a release, the owner of the property must demonstrate that the property has been developed in accordance with an approved plan, and the Board then requires a review of the property to be released, and the only person on KCDC's staff who could perform such review was Dan Tiller.

KCDC relies on the testimony of Tiller and Mr. DeBruhl, executive director to show that the Board has to review such releases, and that such a review was not performed of the Release in question. Tiller testified that he did not remember ever reviewing the Release or recommending it's execution, and that he could not have done so and subsequently forgotten about it. Tiller testified that the Release was not considered by the Board at its December 1991 meeting, and that

-4-

he never "received any report" of any Board action regarding the Release.

Despite KCDC's insistence that the Release was not authorized because Tiller never reviewed it, there are conflicting statements in the testimony of both Tiller and DeBruhl as to the procedure for getting a release authorized and signed. Both men testified that while it was KCDC's general practice for the Board to seek review and approval before authorizing releases, they admitted that there was no formal rule regarding the procedure, and in fact, the Board did have the power to authorize such releases without, or even contrary to, staff review and recommendation. Tiller further admitted that the Board "has the power to delegate the execution of such releases to one or more of its members - to a chairman, to its staff, or to counsel." DeBruhl similarly testified that the Board could delegate "the review procedure and the release function to one or more of its own Board or to one or more of the staff or to counsel. . . ." Baxter testified that while he did not remember the Release, he believed that he would not have signed the Release without property authorization. In signing the Release, Baxter had to swear that he had the authority to sign it "for the purposes therein contained". He testified that he was certain he would not have so sworn without authority.

KCDC also relies on general theories of law regarding municipal corporations in support of its claim that it should not be bound by Baxter's action, citing to McQuillen Municipal Corporations at §29.15, which states that members of a council or board a public corporation cannot separately and individually enter into a contract which will bind the municipality. It also points out that because it is a municipal agency, the extent to which it is bound by the agents or employees is more strictly scrutinized than the actions of agents of employees of private corporations, and as a result, courts are reluctant to find that an officer of an entity has an "implied power" on behalf of that entity. *McDonald v. Scott County*, 87 S.W.2d 1019, 1021 (Tenn. 1935).

However, the authorities cited by KCDC suggest that Baxter's execution of the Release would be valid, even if not properly authorized, based upon the fact that it was a matter of common knowledge that under KCDC's by-laws, the Board chairman had the authority to execute releases.

> Except where power to make a particular contract is especially given to some officer or agent, or there appears to be a clear course of dealing with the world implying authority in an officer or agent, a corporate contract can be made only by, or with the authority of the Board of Directors.

19 C.J.S. Corporations §615.

KCDC has failed to show, by clear and convincing evidence as the Trial Court found, that Baxter did not have actual authority to sign the Release. KCDC bases its claim on the fact that there is no concrete evidence that Baxter had the authority to sign the Release. However, KCDC had the burden, and the absence of proof of authority does not amount to clear and convincing proof of lack of authority. Moreover, KCDC's evidence suggests a Release may be authorized, even where Tiller did not review it.

Finally, KCDC argues that as a matter of law such release was proscribed by Tennessee Code Annotated §13-20-204(b) and §13-20-409. Those sections provide in pertinent part:

**13-20-204. Land Used in Accordance with Redevelopment Plan.** . . . (b)(1) To assure that land acquired in a redevelopment project is used in accordance with the redevelopment plan, an authority, upon sale or lease of such land, shall obligate the purchasers or lessees to:

(A) Use the land for the purpose designated in the redevelopment plan:

(B) Begin the building of their improvements within a period of time which the authority fixes as reasonable. . .

(C) Comply with such other conditions as are necessary to carry out the purposes of this chapter.

(2) Any such obligations by the purchaser shall be covenants and conditions running with the land where the authority so stipulates.

**13-20-409 Duties.** The Authority and its commissioners shall be under a statutory duty to comply or to cause compliance strictly with all provisions of this chapter, and the laws of the state and in addition thereto with each and every term, provision and covenant in any contract of the authority on its part to be kept or performed.

The language of the statutes does not prohibit the release of undeveloped property under all circumstances. The statutes provide that the property should be used in accordance with a "redevelopment plan" set up by a government authority for the development of a certain area. There is nothing that requires development of every parcel or that prohibits KCDC from determining how much development of a parcel should be required. KCDC deeded Parcel 21 to Woodfam's predecessors, and required development of Phase I to occur within a definite time period. It only required that development of Phase II be accomplished as soon as "practicable". KCDC never acted for over 26 years since the contract date to declare a default for non-development of Phase II. Moreover, Tiller testified at trial that KCDC had the power to decide that in certain circumstances, development of a certain portion of property within an urban renewal project would not be required, and to omit the development restrictions altogether, for the overall benefit of the project.

While §13-20-204 states that the restrictions are to "run with the land", T.C.A. §13-20-104 permits KCDC to release deed restrictions.[1]

_____

[1]**13-20-104. Powers of Housing Authority.** - (a) An authority has the power to:

. . . (18) Sell, exchange, transfer, assign, or pledge any property, real or personal or any

We affirm the judgment of the Trial Court that KCDC did not meet the burden of showing a lack of authority to release the deed restrictions by clear and convincing evidence.

The cost of the cause is assessed to the appellant, and the cause remanded.

                                   _____

                                   HERSCHEL PICKENS FRANKS, JUDGE

interest therein to any person, firm, corporation, municipality, city, or government. . . .