IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 10, 2007

## STATE OF TENNESSEE v. ROBERT AUSTIN

**Appeal from the Criminal Court for Shelby County**
**No. 00-07328-30      Joseph B. Dailey, Judge**

**No. W2005-01963-CCA-R3-CD  - Filed September 10, 2007**

A Shelby County jury found the Appellant, Robert Austin, guilty of two counts of first degree premeditated murder and one count of criminal attempt to commit first degree premeditated murder. Following the penalty phase of the trial, the jury sentenced Austin to two terms of life imprisonment without parole.  At a subsequent sentencing hearing, the trial court sentenced Austin to forty years, as a Range II offender, for the attempted first degree murder and ordered that all of his sentences run consecutively.  On appeal, Austin presents the following issues:  (1) whether the trial court erred in disallowing expert testimony regarding Austin's capacity to form the requisite intent for intentional or knowing offenses; (2) whether the evidence is sufficient to support the convictions; and (3) whether the trial court erred in ordering consecutive sentencing. With regard to issue (1), we conclude that the trial court erred in excluding expert testimony; however, the error was harmless. The remaining issues are without merit.  Accordingly, the judgments of conviction and the imposition of consecutive sentences are affirmed.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Robert Wilson Jones, Shelby County Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); Larry Nance and Kathy Kent, Assistant Public Defenders (at trial), Memphis, Tennessee, for the Appellant, Robert Austin.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Nicole Germain, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**Factual Background**

Between 11:30 p.m. on January 26 and 2:00 a.m. on January 27, 2000, Memphis police officers received a call to proceed to 869 North Third Street. The officers arrived at the address, which was a rooming house, and were met by the Appellant, who informed the officers that "three guys were trying to rob me, so I shot them. . . . They're back here in my room." The officers noted that the Appellant was "totally calm" and that his statements and responses to their questions were made without emotion. Upon entering the Appellant's room, the music from the stereo was so loud that the officers were unable to communicate with the Appellant until the volume was turned down. The officers observed the deceased victim, Donnell Crowder, in a sitting position on the couch. This victim had a visible gunshot wound to his head, his head was slumped over his left arm, and the television remote control was in his right hand. Post-mortem examination revealed that the fourteen-year-old Crowder had sustained a gunshot wound to the right side of his head, with the bullet traveling through the brain in a slightly downward direction. The officers also observed two other victims, who were on the floor with their bodies lying on top of each other. The victim on top, fifteen-year-old Robert Crowder, the brother of Donnell Crowder, was also deceased. Post-mortem examination established that Robert Crowder had sustained a gunshot wound to the left side of his head directly above the left ear, with the bullet traveling downward through the brain, and a gunshot wound to the left foot. The medical examiner opined that both deceased victims were shot from a distance of over two feet because no evidence of "stipple" was found. Officers noted "gurgling" sounds coming from the victim on the bottom, who was later identified as nineteen-year-old Antonio Knapp. Knapp was immediately rushed to the hospital with a single gunshot wound to the head. Due to the severe nature of the head wound, Knapp was required to undergo extensive medical treatment, resulting in an extended period of hospitalization and four years of convalescence in a nursing home facility. Knapp, now disabled, walks with the assistance of a walker and has considerable problems with recall and mental functioning. While at the scene, the police recovered a six shot .38 caliber revolver containing five spent casings and one live round, which the Appellant stated he used to shoot the victims. No weapons were found on or near any of the victims. Officers also noted that no "signs of struggle" were apparent.

The proof established that the two Crowder brothers had been absent from home without permission for three days prior to January 26th, and their mother had enlisted the aid of her nephew, Antonio Knapp, to help locate them. It was not uncommon for the forty-year-old Appellant to invite neighborhood teenagers into his home. The Appellant would oftentimes cook meals for young boys, and, occasionally, he would pay them to clean his room or to perform sexual favors. Antonio Knapp had known the Appellant for approximately three years, and, during that time, the Appellant had paid Knapp to "have sex with him." Knapp had only recently stopped visiting the Appellant when he became interested in a fifteen-year-old girl, Orlisa Reed. The Appellant learned of Knapp's relationship with Reed and told Knapp's close friend, DeAngelos Thomas, weeks before the shooting, that he was going to kill Knapp because Knapp was cheating on him.

On January 26, 2000, Knapp went to the Appellant's boarding house because he knew that his cousins, the Crowder brothers, had visited with the Appellant previously. At trial, Knapp testified that when the Appellant answered the door, he would not confirm whether his cousins were there but told Knapp, "Just come in the house." Once Knapp entered the Appellant's room, the

Appellant locked the door. Donnell and Robert Crowder were seated on the couch, eating a meal and watching a movie. Knapp also recalled that his cousins and the Appellant were drinking beer and that the Appellant was smoking "weed." The Appellant furnished Knapp with some "weed," which he smoked. While at the Appellant's house, Knapp called Orlisa Reed on his cell phone. Reed could hear someone in the background commenting about "bitches and whoes," and she could hear the man "cussing [Knapp] out." Knapp told her the man was "talking about he was going to kill him." She asked him if she should call the police, and, initially, he told her to call but then told her not to call. At one point during the phone conversation, a man came on the line and asked Reed, "Are you the one for [Knapp]?" to which she replied "yes." Knapp got back on the phone and asked her if she loved him and if she would come to his funeral. At trial, Knapp testified that at some point the Appellant came out of his bedroom with a pistol while Knapp and the Crowder brothers were on the couch. According to Knapp, "[the Appellant] stood in front of me . . . with the gun on me. After I stand up and stuff, he hit me – standing up there arguing – you know what I'm saying – talking to him." Then . . . he just boom, shot me, so I guess I fell down."

DeAngelos Thomas testified at trial that he saw his friend, Tony Knapp, go into the Appellant's house on the night of the shooting and that he later telephoned the Appellant to make sure that Knapp was alright. After briefly talking to Knapp, the Appellant got on the telephone and asked Thomas if he "wanted them killed." At trial, the following colloquy ensued:

[Thomas]: I said, "For what?"

[Prosecutor]: And what did [the Appellant] say?

[Thomas]: "I'm gonna kill them. I'm gonna kill them." I'm like, "For real?" I thought he was playing or something.

Based upon the above evidence, the jury found the Appellant guilty of the first degree premeditated murder of Donnell Crowder, the first degree premeditated murder of Robert Crowder, and criminal attempt to commit the first degree premeditated murder of Antonio Knapp. After a sentencing hearing on the first degree murder convictions, the jury sentenced the Appellant to life without the possibility of parole for each of the two convictions. Following a separate sentencing hearing, the trial court sentenced the Appellant to forty years, as a Range II offender, for his conviction for attempted first degree premeditated murder. The trial court determined that each of the Appellant's convictions should be served consecutively, resulting in an aggregate sentence of two life sentences without possibility of parole plus forty years. The Appellant's motion for new trial was denied, and this appeal followed.

**Analysis**

## I. Expert Testimony on Diminished Capacity

After the close of the State's proof, trial counsel advised the court of his intention to call Dr. Angelillo, a clinical psychologist, and that counsel was "a little unsure as to how to question him with respect to the ultimate question – as to whether – because of [the Appellant's] mental defect, he was unable to act intentionally or knowingly or recklessly." At the jury-out hearing, the State opposed trial counsel's question as framed, arguing, "[t]hat's for the jury to determine – not for Dr. Angelillo or any other expert." After consideration of the respective arguments, the trial court ruled as follows:

> I don't think that it would be appropriate for this psychologist to be asked to answer a question that calls for an ultimate conclusion on the issues of the case that are really for the jury to determine. I mean, this question in this context of a diminished-capacity defense is under the umbrella of what the [insanity] statute specifically precludes in my opinion . . . . It would be totally illogical, I think, for the [insanity] statute to not allow this type of question, but to allow it to be asked in the context of diminished capacity defense. I think this follow[s] the logic of the statute and of the Flake case; and I think that it would be inappropriate to ask this psychologist this question in front of the jury, so I'll preclude you from doing it.

Notwithstanding the trial court's ruling, trial counsel requested and was granted the opportunity to make, in pertinent part, the following testimonial offer of proof:

| [Trial Counsel]: | We've talked about Mr. Austin's capacity to perform the act intentionally and to act knowingly and to act recklessly, haven't we? |
|---|---|
| [Dr. Angelillo]: | Yes, sir. |
| [Trial Counsel]: | And I've given you the definitions of those three mental states. Intentionally being to act with a conscious objective either to cause a particular result or engage in a particular conduct. |
| [Dr. Angelillo]: | Yes, sir. |
| [Trial Counsel]: | And Mr. Austin, does he suffer from a mental disease or defect? |
| [Dr. Angelillo]: | He's been diagnosed and suffers from a mental disease. |
| [Trial Counsel]: | And what is that disease? |
| [Dr. Angelillo]: | He was diagnosed many years ago with schizophrenia, paranoid type. |

[Trial Counsel]:       And does he still suffer from that disease?

[Dr. Angelillo]:       To the best of my knowledge, the last time I saw him, he was still suffering from that disease.

[Trial Counsel]:       And did you see him after January 27th, 2000?

[Dr. Angelillo]:       Yes, sir.

                       . . . .

[Trial Counsel]:       Does he also have intellectual problems?

[Dr. Angelillo]:       Yes, sir. I tested Mr. Austin. He had a – I believe a 49 IQ. I'm not thinking that that's the most valid indicator of what his IQ is; however, he had been diagnosed many years before, I believe, as either mild at one time and borderline mentally retarded and had a history of learning problems. I believe he was in special education or resource classes throughout his education. At least the documentation that I've reviewed indicates that.

                       . . . .

[Trial Counsel]:       On January the 27th of 2000, do you have an – well, do you have an opinion of whether, on January the 27th of 2000, he was able to act intentionally?

[Dr. Angelillo]:       My opinion is that there is a – there was a – his mental and intellectual difficulties impacted his capacity to act intentionally.

                       . . . .

[Trial Counsel]:       Do you have an opinion as to whether, on January the 27th of 2000, he was able to act knowingly?

[Dr. Angelillo]:       I believe that – in my opinion, his ability to act knowingly was impacted in this similar way.

                       . . . .

| [Trial Counsel]: | And we also discussed the element of premeditation, did we not? |
|---|---|
| [Dr. Angelillo]: | Yes, sir. |
| | . . . . |
| [Trial Counsel]: | Okay.  Do you have an opinion as to whether, on January the 27th of 2000, he was able to premeditate? |
| [Dr. Angelillo]: | My opinion was, on that date, he would and did for years have difficulty with reflecting upon the enormity of the behavior that he was – or the offense with which he was accused.[1] |

In *State v. Shuck*, our supreme court held:

Under Tennessee law, "testimony in the form of an opinion or inference *otherwise admissible* is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Tenn. R. Evid. 704 (emphasis added). . . .  With respect to expert testimony, this rule is consistent with Tennessee common law.  For example, this Court in 1977 held that "an expert's opinion is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact, so long as it is helpful to the court."  *City of Columbia v. C.F.W. Const. Co.*, 557 S.W.2d 734, 742 (Tenn. 1977).

953 S.W.2d 662, 668-69 (Tenn. 1997).

It is firmly established that a defendant's capacity to form the requisite mental state to commit an offense is a proper issue in criminal prosecutions because the general criminal law in Tennessee provides that "[n]o person may be convicted of an offense unless . . . the culpable mental state required is proven beyond a reasonable doubt."  T.C.A. § 39-11-201(a)(2) (2006); *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1996) (citing *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994).  Accordingly, evidence of diminished capacity, which is not a defense to a crime, but rather

---

[1]Following the offer of proof, Dr. Angelillo was called as an expert witness by the Appellant, despite the fact that an insanity defense was not asserted at trial and that the Appellant was precluded from presenting "diminished capacity" testimony by the trial court's ruling.  Dr. Angelillo testified at length with regard to the Appellant's longstanding diagnosis of paranoid schizophrenia and borderline mental retardation.  This witness' testimony, in turn, resulted in the State calling two allegedly rebuttal witnesses, Dr. Sam Craddock and Dr. Rokeya Farooque, who again testified at considerable length with regard to the Appellant's diagnosed mental illness, their finding of incompetency during the Appellant's pretrial detention, the Appellant's malingering, and his current level of mental functioning.  Indeed, although an insanity defense was not advanced, nor was proof developed with regard to diminished capacity, expert testimony was presented resulting in one hundred thirty-two transcribed pages of testimony detailing the Appellant's past and present mental health status.  The record reflects the jury was instructed with regard to diminished capacity.

a rule of evidence, is admissible to negate the existence of the culpable mental state required to establish the criminal offense charged. *Hall*, 958 S.W.2d at 688-89; *Phipps*, 883 S.W.2d at 143. Moreover, the court in *Shuck* noted that, "[i]n Tennessee the only ultimate issue about which an expert explicitly cannot offer an opinion is whether the defendant was or was not sane at the time of commission of the criminal offense." *Shuck*, 953 S.W.2d at 663 n.3. Further, the 1996 Advisory Commission Comment to Tenn. R. Evid. 704 also notes that, "[o]ne ultimate issue is outside the scope of expert testimony. Tenn. Code Ann. § 39-11-501 provides that 'no expert witness may testify as to whether the defendant was or was not insane.'"

If general relevancy standards and evidentiary rules are satisfied, "psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997). The trial court's comparison to the insanity statute is misplaced. The State is not required to prove a defendant's sanity because it is not an element of the offense of first degree murder. *State v. Holton*, 126 S.W.3d 845, 860 (Tenn. 2004); *see also Hall*, 958 S.W.2d 689 (while the law presumes sanity it does not presume mens rea). Moreover, in 1995 our legislature amended the insanity statute to reflect that "[n]o expert may testify as to whether the defendant was or was not insane . . ." The Commission Comment to Tenn. R. Evid. 704 acknowledges the exclusion of expert testimony on the ultimate issue of insanity. However, after the 1994 *Phipps* decision and the subsequent decision of *Hall* permitting diminished capacity testimony, no attempt has been made to amend Rule 704 to prohibit expert testimony on the ultimate issue of whether the accused had the capacity to form the requisite mental state of the crime charged.[2] Accordingly, we conclude that the trial court erred, as argued by the Appellant, in disallowing expert testimony with respect to the ultimate question, *i.e.*, whether because of the Appellant's mental disease, he was unable to act intentionally, knowingly, or with premeditation. *See State v. Faulkner*, 154 S.W.3d 48, 56 (Tenn. 2005) (citing *Hall*, 958 S.W.2d at 689); *State v. Brandon Mobley*, No. E2006-00469-CCA-R3-CD (Tenn. Crim. App. at Knoxville, June 11, 2007) (trial court erred in excluding testimony of expert witness who would have testified that, due to defendant's mental disease or defects, "he could not have premeditated the shooting"); *State v. Terry Proffitt*, No. 03C01-9712-CC-00530 (Tenn. Crim. App. at Knoxville, June 2, 1999) (trial court erred in prohibiting expert witness from testifying that defendant's mental illness rendered him incapable of "knowingly" killing victim).

Our conclusion of error does not, however, end our inquiry as we must next determine whether the error was harmless or reversible. *See* Tenn. R. App. 36(b). During the Appellant's offer

---

[2]As observed in *Shuck*, "Tennessee Rule of Evidence 704 is more lenient than its federal counterpart with respect to the admissibility of opinion testimony on an ultimate issue to be decided by the trier of fact." *Shuck*, 953 S.W.2d at 668. Federal Rule of Evidence 704(b) provides:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

of proof, Dr. Angelillo testified, as noted *supra*, with regard to whether the Appellant could act intentionally on January 27, 2000, by stating "[m]y opinion is that . . . his mental and intellectual difficulties impacted his capacity to act intentionally." Dr. Angelillo testified that the Appellant's "ability to act knowingly was impacted in this similar way" and that his "capacity to act without recklessness was less impacted than the other two." When asked regarding the Appellant's ability to premeditate, he stated "[m]y opinion was, on that date, he would and did for years have difficulty with reflecting upon the enormity of the behavior that he was – or the offense with which he was accused." In *Hall*, our supreme court articulated a two-prong test for establishing "diminished capacity": (1) that the defendant was suffering from a mental disease or defect; and (2) that the defendant's inability to form the requisite culpable mental state was the product of the mental disease or defect, and not just a particular emotional state or mental condition. *Hall*, 958 S.W.2d at 689. "It is the showing of a lack of *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue." *Id*. at 690 (emphasis in original); *see also Faulkner*, 154 S.W.3d at 56-57 (reaffirming the "lack of capacity" threshold requirement); *Phipps*, 883 S.W.2d at 148 (evidence of the accused's state of mind at the time of the offense is admissible to negate the existence of the requisite mental state of the charged crime); *State v. Shelton*, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992) (it is the showing of a lack of capacity to form the requisite culpable mental intent that is central to diminished capacity). In *State v. Antonio D. Idellfonso-Diaz*, this court held that an expert witness was properly precluded from presenting testimony regarding the defendant's diminished mental capacity at the time of the crimes. No. M2006-00203-CCA-R9-CD (Tenn. Crim. App. at Nashville, Nov. 1, 2006). This court concluded that the expert's testimony was inadmissible because "he could not say that the [defendant] lacked the capacity to form the culpable mental states but could only say that his capacity was 'impaired to some extent.'" *Id*. "The fact that the [defendant's] mental disease impaired or reduced his capacity to form the requisite mental state does not satisfy the two-prong requirement in *Hall* and *Faulkner*." *Id*. Similarly, in this case, Dr. Angelillo did not testify that the Appellant was incapable of forming the requisite mental states because of the Appellant's mental disease. Rather, he testified only that the Appellant's disease "impacted his capacity" to form the requisite mental states.[3]

We conclude that the holding of *Hall* is controlling. *Hall*, 958 S.W.2d at 692. Accordingly, we conclude that although the trial court erred in ruling that testimony with regard to the ultimate issue of the Appellant's mental state was inadmissible, the effect of this ruling was harmless in view of the fact that the expert's testimony did not meet the "lack of capacity" standard of *Hall*.

## II.     Sufficiency of the Evidence

The Appellant asserts that "the [S]tate failed to carry its burden of proving beyond a reasonable doubt that the homicides and the attempted homicide [were] premeditated and that the evidence . . . is insufficient to support his conviction[s] for premeditated first degree murder and

---

[3]Our supreme court in *Hall* appears to suggest that the term "diminished capacity" is somewhat of a misnomer, because the proof must not simply show the defendant's mental capacity was diminished, rather there must be "the showing of a lack of capacity" to form the requisite mental state. *Hall*, 958 S.W.2d at 690 (emphasis added).

attempted first degree murder." When a challenge is made on appeal to the sufficiency of the convicting evidence, this court is guided by certain well-established principles. First, a jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Rice*, 184 S.W.3d 646, 661 (Tenn. 2006); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *Rice*, 184 S.W.3d at 662; *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *State v. Adkins*, 786 S.W.2d 642, 646 (Tenn. 1990); *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). These rules apply to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779-80 (Tenn. Crim. App. 1990).

First degree premeditated murder is statutorily defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). An act is premeditated if the act is "done after the exercise of reflection and judgment." *Id*. at (d). In other words, the "intent to kill" must have been formed prior to the act of murder itself. *Id*. Additionally, it is not necessary that the purpose to kill pre-exist in the mind of the accused for a definite period of time; however, the trier of fact must be satisfied that the accused was sufficiently free from excitement and passion as to be capable of premeditation. *Id*.

The element of premeditation is a factual question to be determined by the trier of fact with consideration of all the circumstances surrounding the killing. *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005) (citing *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003)). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the killer's conduct in light of the surrounding circumstances. *Id*. (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). Our supreme court has identified numerous circumstances that may support a finding of premeditation, including, but not limited to: declarations by the defendant of the intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition to these factors, the establishment of the motive for the killing is yet another factor from which the trier of fact may infer premeditation. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

**A.      Criminal Attempt to Commit the First Degree Premeditated Murder of Knapp**

The Appellant asserts there was insufficient evidence to support his conviction for the attempted murder of Knapp. Specifically, he asserts that the State failed to prove the Appellant committed a "premeditated and intentional act." In order to support a conviction for criminal attempt to commit first degree murder, there must be evidence that the Appellant committed a criminal attempt, which, as relevant to this case, is defined as "acting with the kind of culpability otherwise required for the offense" and "act[ing] with intent to cause a result that is an element of the offense, and believ[ing] the conduct will cause the result without further conduct on the person's part. . . ." T.C.A. § 39-12-101(a)(2) (2006). Additionally, the proof must establish that the Appellant acted with premeditation. *See* T.C.A. § 39-13-202(a)(1).

The proof at trial showed that the Appellant had engaged in a sexual relationship with Knapp, and, prior to developing a close friendship with Orlisa Reed, Knapp would "hang out at [the Appellant's] house a lot." The Appellant told one of Knapp's friends, DeAngelos Thomas, that he was going to kill Knapp, and Thomas attributed the threat to the Appellant's belief that Knapp was cheating on him with Reed.

On the night of the shooting, Knapp went to the Appellant's room in the boarding house searching for his cousins, the Crowder brothers. The Appellant coaxed Knapp to come into his room, and the Appellant locked the door. While at the residence, Knapp called Reed on his cell phone, and, at one point, she could hear a man ranting about "bitches and whoes" and cursing Knapp. Knapp told her the man was "talking about he was going to kill him." Toward the end of the phone call, a man came on the line and asked, "Are you the one for [Knapp]?" Knapp got back on the phone and asked her if she loved him and if she would come to his funeral.

Around 11:00 p.m., Thomas called the Appellant's residence, and the Appellant asked Thomas if he "wanted them killed." Thomas asked, "For what?," and the Appellant replied, "I'm gonna kill them. I'm gonna kill them."

Sometime between 11:30 p.m. and 2:00 a.m., the Appellant called the police, and, when they arrived, he calmly stated, "These three guys were trying to rob me, so I shot them." The proof established that Knapp nearly died from his injuries and, after extensive medical care and years in recovery, is still both mentally and physically incapacitated.

Applying the factors identified by our supreme court, we conclude that there are multiple circumstances from which the jury could have found that the attempted murder of Knapp was intentional and premeditated. Those include: (1) the Appellant's repeated declarations that he was going to kill Knapp; (2) Knapp was an unarmed victim; (3) the Appellant made preparations for the murder by locking the door and, later, by turning the volume up on the stereo so it would conceal the sound of gunshots; and (4) the Appellant's calmness immediately after the shootings.

### B.     First Degree Premeditated Murder of Donnell and Robert Crowder

The medical examiner for Shelby County testified that Donnell Crowder was shot on the right side of his head, slightly behind his right ear. His brother, Robert Crowder, was shot in the left side of his head, directly above the ear, and in the left foot. Testimony at trial established that shortly before the two victims were shot, the Appellant asked Thomas if he wanted them killed. Neither victim was armed with a weapon. In fact, Donnell Crowder was seated on the couch holding the remote control to the television in his right hand when he was shot.

The jury was entitled to disregard the Appellant's explanation that he shot the victims when they tried to rob him, which is contradicted by the physical location of the victims in the room and the location of the entrance wounds on the victims' bodies. Moreover, there was no evidence of a struggle in the Appellant's small room. Again, applying the *Bland* factors, we conclude that there are multiple circumstances from which a jury could have rationally found that the homicides of the two victims was committed intentionally and with premeditation. Those include: (1) the Appellant's declaration to DeAngelos Thomas on the evening of the victims' murder that he was "gonna kill them"; (2) the two victims were unarmed; (3) the Appellant made preparations by turning up the volume on the stereo to muffle the sound of gunshots; and (4) the Appellant's calmness immediately after the shootings. Accordingly, we conclude that the evidence is legally sufficient to support the convictions.

## III. Consecutive Sentencing

On appeal, the Appellant asserts that "the trial court erred in ordering consecutive sentencing because he does not have an extensive criminal record within the meaning of the statute and he is not a dangerous offender." A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "[t]he defendant is an offender whose record of criminal activity is extensive" or that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(2), (4) (2006). The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved" under the circumstances. T.C.A. § 40-35-102(1), –103(2).

In imposing consecutive sentences, the trial court found:

[Section 40-35-115(b)(2)] is established [by] his record; criminal activity is extensive as is borne out by the presentence report.

[Section 40-35-115(b)(4)] obviously is established by the facts of the case.
The facts of this case were so repugnant and repulsive that there's not a lot that can be said at sentencing, in my opinion, by me at least, other than this man deserves to stay in the penitentiary for as long as we can possibly put him there – we being the system. I think that factors numbered 2 and 4 clearly apply in the consecutive

sentencing issue; and, therefore, I will sentence him to serve all three of his sentences consecutively to one another.

Initially, we note that a finding of either of the two criteria relied upon for consecutive sentencing would have justified the trial court's imposition of consecutive sentences. The record in this case clearly supports the trial court's finding that the Appellant is an offender whose record of criminal activity is extensive. *See* T.C.A. § 40-35-115(b)(2). The Appellant has two prior convictions involving homicides, two convictions involving bodily injury, and two misdemeanor convictions. In 1991, the Appellant was convicted of criminally negligent homicide, and, in 1984, he was convicted of voluntary manslaughter. In 1987, he was convicted of aggravated assault, and, in 1981, he was convicted of assault with intent to commit second degree murder. Thus, we conclude that the trial court did not abuse its discretion in ordering the Appellant's three sentences to be served consecutively on the basis that he had an extensive criminal history.

The trial court also found that the Appellant was a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. Before imposing consecutive sentences on this basis, the trial court was required to determine (1) if the resulting sentence was reasonably related to the severity of the crimes and (2) if consecutive sentences were necessary to protect the public from further criminal conduct. *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). The trial court referred to these criteria in its finding that the offenses were repugnant and repulsive and that the Appellant deserved to be sentenced to the penitentiary for as long as possible.

After conducting a *de novo* review, with a presumption of correctness, we conclude that the trial court's imposition of consecutive sentences on the basis that the Appellant was a dangerous offender is supported by the record. The Appellant's conduct in the commission of the crimes was senseless and reprehensible. The facts of the case clearly demonstrate that the Appellant had little or no regard for human life and no hesitation about committing a crime in which the risk to life was high. *See* T.C.A. § 40-35-115(b)(4).

Moreover, we conclude that consecutive sentencing is necessary to protect the public from further criminal behavior by the Appellant. The Appellant has been convicted of two homicides, an aggravated assault, and an assault with intent to commit second degree murder. The Appellant murdered two young boys and almost took the life of a third; however, his only comment in the presentence report was that the police officers "lied at [his] trial." The Appellant's comment in the presentence report indicates that he remains steadfastly unrepentant for his criminal conduct. Finally, we conclude that the length of the aggregate sentence is reasonably related to the severity of the offenses. Thus we conclude that the record supports an effective sentence of two life sentences without the possibility of parole plus forty years.

**CONCLUSION**

Based on the foregoing, the Appellant's judgments of conviction and the imposition of consecutive sentences are affirmed.

_____
DAVID G. HAYES, JUDGE