IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 29, 2022 Session

## STATE OF TENNESSEE v. CAPONE CARROLL STRANGE

**Appeal from the Criminal Court for Scott County**
**No. 11475-A    E. Shayne Sexton, Judge**

___

### No. E2021-00763-CCA-R3-CD

___

The defendant, Capone Carroll Strange, appeals his Scott County Criminal Court jury conviction of aggravated child abuse, arguing that the jury venire was improperly influenced by the victim, that the trial court erred by failing to strike a juror for cause, that a State witness gave improper expert testimony, and that the evidence was insufficient to support his conviction.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and D. KELLY THOMAS, JR., JJ., joined.

Charles Patrick Sexton, Oneida, Tennessee for the appellant, Capone Carroll Strange.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Jared Effler, District Attorney General; and David M. Pollard and Apryl C. Bradshaw, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Scott County Grand Jury charged the defendant with alternative counts of aggravated child abuse.[1]

The victim, who was four-years-old at the time of trial, testified that she lived with her family, including her mother and two siblings and a man that she called "daddy." When asked if that man had "always been your daddy," the victim replied, "Yeah, but I got a mean daddy," "[h]is name is Capone."  She said that she called him "mean" because "[h]e's a mean daddy" and that "he be mean to me."  The victim identified a photograph

___

[1]    Co-defendant Savannah Lynn Jeffers was also charged with one count of failing to report the abuse.

of herself, and said, "I'm bruised in the eye." She said that she got the bruise because on an occasion while she was at the defendant's house, the defendant "punched me in the eye" with "[h]is fist." The victim said that the defendant also "hurt me on the hip," but when asked to point to the area of her hip where the defendant hurt her, the victim pointed to her ribs. The victim said that he "bruise[d] my rib" and "hurt me on the rib . . . and belly" when "[h]e throwed me on the bed where the bars are," explaining that the bars were on "[t]he side of the bed." The victim said that the defendant threw her on the bed "[b]ecause he was being mean to little girls like that," noting, "We wasn't in trouble, we wasn't arguing, we wasn't fighting. He done that for a reason." The victim denied that the defendant had ever hit or spanked her with anything other than his fists. The victim remembered playing with the defendant's daughter, "the one that pulls my hair," the same weekend that she received her injuries. She denied that she and the defendant's daughter had any accidents that weekend but recalled that the defendant "left me outside by myself" "when no one was there."

The victim identified a photograph of herself in which she had "[a] bruise" on her arm from where "[my] daddy squeezed me on the arm" because "he was being mean to me," which incident occurred at the same time that she received the black eye. She identified photographs of herself that showed where the defendant also "bruised me on the back of the ears -- on back of my ears on the bone," but she could not remember how the injury occurred.

During cross-examination, the victim denied that anyone told her to say that the defendant had been mean to her. She explained that when the defendant threw her on the bed, he had "broke[n] a piece of the bar with a drill" and "threw it on the bed," which bar caused her injuries. She said that she and the defendant's daughter would run through the house together but said that she did not like being around the defendant's daughter "[b]ecause she takes toys," pushes the victim, and "pulls my hair." She acknowledged that the defendant's daughter had hurt her "[o]n the arm" and had pushed her down but said that the defendant caused the bruise to her arm when he picked her up by her arm and "[p]inched me" "[o]n the right wrist." She said that when the victim punched her in the eye, his hand was "[o]pen."

The victim's mother testified that the victim was born on July 27, 2015. She said that, although the defendant was the victim's father, she and the defendant were never in a serious relationship. She said that the defendant never saw the victim until the victim "was two, almost three maybe" and that the defendant got shared custody of the victim. The victim's mother said that the victim did not like staying with the defendant, but the victim's mother was happy that the defendant was involved in the victim's life. She said that the defendant lived with his grandmother at the time and that that was where the victim stayed when she was in the defendant's custody. The defendant's girlfriend and daughter

also lived in the house.

On the night of December 5, 2018, the three-year-old victim was staying with the defendant. The victim's mother had noticed that the victim "had been a little sick" but that "she wasn't bad or anything but she was sick." She and the defendant communicated primarily through Facebook Messenger and "sometimes text." On the morning of December 6, the defendant messaged the victim's mother that he was taking the victim to the doctor because she was running a fever, but the victim's mother was not concerned for the victim's wellbeing at that point. A couple of hours later, the defendant messaged the victim's mother, telling her that the victim and the defendant's daughter "'were playing in the playroom because I was making them noodles, and [the victim] and [the defendant's daughter] were running and must have gotten tripped up and fell. [The victim] has a pump knot and it blacked her eye.'" The defendant's message further explained, "'[The victim] said [the defendant's daughter] tripped and fell on her and made her hit her head again. [T]aking her to the d[octo]r in just a bit. Figured I'd let you know. [The victim's] okay tho[ugh].'"

The victim's mother asked the defendant how the victim got "'a knot and a black eye from falling down'" and asked the defendant to send her a photograph of the victim. The defendant sent her a photograph of the victim and also sent a photograph of a dresser, saying that he thought the victim had hit the dresser when she fell. The victim's mother said that although "my gut kind of made me feel concerned," she was not particularly worried based on the photograph of the victim and the defendant's explanation of what had occurred. At that point, the victim's mother believed the victim's injuries were limited to a black eye and a knot. She denied that the victim had any bruises on her body before going to the defendant's house. The defendant continued to message the victim's mother with "mixed up stories" of "things that could have happened or may have happened." Later that day, the defendant told the victim's mother that he could not get the victim a doctor's appointment until the next day. Before the victim's mother picked up the victim the next day, the defendant texted her a photograph of the victim with her eye appearing "a lot more bruised than what it looked like in the first two pictures that he had sent me. You can see, you know, the actual scratches and the bruising and everything. It looks a lot worse." At that point, the victim's mother became concerned, noting, "I thought that was odd because she was coming home and that's when he decided to show me what [the victim's injuries] really looked like."

The victim's mother said that she and the defendant continued to message each other about the incident. She said that their conversations were ordinarily not friendly and "[u]sually, it was more of an argument," but on that day, the defendant was "[e]xtra friendly" and playful. She said that the defendant was also defensive and "kept trying to give me an explanation for what happened." The defendant sent the victim's mother

another photograph of the victim, saying, "'See it's just her forehead and eye and she had to have hit her ear cause it's bruised as well. If you can call me right fast I can explain better of what I gathered and figured what happened[.]'"

The defendant told the victim's mother that he had taken the victim to the Fast Pace medical clinic the morning after the victim fell, but the victim's mother learned from the clinic that Ms. Jeffers had signed the victim's paperwork, identifying herself as the victim's mother. The victim's mother said that the defendant continued trying to explain what had happened "[p]retty much . . . the whole entire time until she came home." In one message, the defendant said that "'as far as [the victim] getting beat, or neglected or any of that stupid shit, it's not happening here and never will. I love her to death and wouldn't ever touch or hit a kid.'" The defendant's continued attempts to explain the victim's injuries caused the victim's mother to become "pretty worried about . . . what she was gonna look like." She said that at first, she thought the defendant was paranoid that she "was going to try and have him prosecuted for something he didn't do, but whenever I saw her and saw all the bruises, that's whenever I knew what it . . . was really about."

On December 7, 2018, "a little before 5:00" p.m., the victim's mother met the defendant at the "old tack shop" to pick up the victim. As soon as the victim's mother arrived, the defendant and Ms. Jeffers "both jumped out of the car to talk to me." She said that ordinarily, only Ms. Jeffers would get out and bring the victim to her because she and the defendant did not get along. On this occasion, however, "they both got out . . . and were just talking to me, talking my head off." The victim's mother strapped the victim into her car seat and saw that the victim's "whole entire ear was black" and bruised. She also saw "[m]ore bruising" on the victim's other ear. She "immediately contacted Delilah [Miller with DCS] and law enforcement" to report the victim's injuries, and two police officers met her at her "mamaw's" house. The victim's mother discovered more bruising on the victim's "arm and her ribs and under her neck and everywhere," "head to toe pretty much." Later that night, she took the victim to East Tennessee Children's Hospital ("Children's Hospital") as directed by Ms. Miller. The defendant continued to message her, but she did not respond. She said that the defendant became "[a]ggressive" when she did not respond to him.

The defendant messaged the victim's mother on December 10, 2018, about his getting the victim, saying, "'Are you gonna show up today or not? And by not telling me the welfare of my child is also breaking court order . . . . Everyone including you knows I wouldn't hit [the victim] so don't even goddamn start that shit . . . . Grow the f*** up or go to jail, idc.'" The victim's mother did not respond, and 11 minutes later, the defendant messaged her again, "'Well that's perfectly okay, cause you know when and we're to meet, so if it's a no show, then you get picked up. So idgaf. Keep doing your stupid a** s*** cause it's getting you nowhere in life.'" The victim's mother understood these messages

to be a threat. She said that Ms. Miller "got an order in place" and told her not to return the victim to the defendant. She said that even if Ms. Miller had not advised her to keep the victim from the defendant, she "wouldn't have sent her back, I would have hid her" "[b]ecause I knew he did it."

During cross-examination, the victim's mother said that other than "once or twice," the defendant did not spend time with the victim until a court-ordered co-parenting arrangement in April 2018. She acknowledged that on a couple of occasions, she kept the victim from the defendant despite the court order "after the visitations had started and I noticed a drastic change in my child." She acknowledged that on December 5, 2018, the defendant expressed concern over the victim's having a fever. Approximately two hours later, he told her that the victim had fallen. The victim's mother acknowledged that the victim was an active child and that it was not unusual for the victim to get scrapes and bruises. She also acknowledged that the defendant's story of what happened to the victim remained "pretty consistent." She said that she had been skeptical of the defendant's having shared custody of the victim "because of the aggression that he's always had" and that co-parenting "was made extremely difficult." She clarified that she was pleased that the defendant was keeping her informed of the victim's injuries, "but I began to worry when he kept overexplaining."

The victim's mother described the victim's injuries:

> She had a bruise on her forehead which was the pump knot, a black eye, both of her ears were bruised, the bridge behind he[]r ears were bruised. She had bruising under her neck, on her chin, she had bruises on her arms. . . . [T]here was fingerprints. Her rib cage was bruised. Her butt was bruised. Her legs were bruised.

She said that the victim no longer had a fever when she picked her up on December 7, saying, "[S]he didn't seem to be very sick anymore. She seemed fine other than the fact that she seemed depressed at three years old."

On redirect examination, the victim's mother acknowledged that, although the defendant's story of the events did not change, he added information in later messages that he did not initially tell her, such as the victim's falling on a block and the victim's having injured her ear. She said that he also omitted telling her that the victim had other bruises.

Chris Russell, a patrol officer with the Scott County Sheriff's Department, testified that he responded to a house on Pine Creek Road in Scott County on December 7,

2018, at 5:28 p.m. to a report of child abuse. He saw that the victim "had some bruises, some places on her that I wasn't really comfortable with." He took photographs of the victim and called a detective and Ms. Miller. The photographs of the victim showed bruising "[o]n the back of her [left] ear and also on the back of her head," the inside of her left ear, her upper ribcage under her left arm, her hip, her lower back near her kidneys, her bottom, and her skull behind her right ear. He advised the victim's mother to seek medical attention for the victim.

During cross-examination, Officer Russell said that the victim's mother told him that the victim had been with the defendant and that she had picked up the victim shortly before calling the police. He acknowledged that he was not medically trained.

Delilah Miller, "a child protective services investigator" with DCS, testified that on December 6, 2018, at 10:03 a.m., the victim's mother texted her about an incident involving the victim while the victim was with the defendant, saying, "'It could[']ve been an accident, [I] don't know. But anyways it was odd to me . . . .'" The victim's mother sent Ms. Miller a photograph of the victim showing the victim with "a pump knot on her head and her eye." Based on the photograph of the victim, Ms. Miller responded that "[i]t could have been" an accident, but "'I have to do a home visit anyways.'" Ms. Miller attempted to do a home visit at the defendant's house, but "they weren't home, and I didn't return after that." The next day, the victim's mother texted Ms. Miller: "'Call me please you need to see my kid. She has bruises from head to toe.'" Ms. Miller was unavailable to respond at that time and told the victim's mother to call law enforcement and to take the victim to Children's Hospital. The next morning, Ms. Miller responded to the victim's grandmother's house and tried to talk with the victim, but the victim "didn't really want to talk." Ms. Miller photographed the victim to determine whether the bruises had changed since the previous day. One photograph showed "bruising on [the victim's] ear on the outside part of her ear and on her skull behind it," which "typically meant the ear had hit this part of the head pretty hard." Another photograph showed bruising on the "back part of [the victim's] arm, and you could see it looks like fingers, like finger marks." In addition to the victim's eye, she also had "some bruising on her face" and "a red mark under her chin."

Ms. Miller advised the victim's mother that she would have the DCS attorney file "something in [c]ourt that would stop the . . . [c]ourt ordered visitation until we figured out what was going on" and arrange for the victim to have a forensic interview. The victim had a forensic interview on December 10, 2018, but "would not talk at all. She literally sat and just stared at the interviewer." The next day, Ms. Miller interviewed the defendant and Ms. Jeffers at the DCS office. The defendant "was cooperative" and told Ms. Miller that the victim and the defendant's two-year-old daughter "were running, [the victim] had socks on, that she fell, she hit her head on this wood . . . dresser thing . . . . And then [the

defendant's daughter] fell on top of [the victim] and she fell on some toys." Ms. Miller said that the defendant's story "was really very confusing to me, didn't really make sense." She showed the defendant the photographs of the victim's injuries, and the defendant said that the victim "didn't have these bruises when she left me." When Ms. Miller told the defendant that the photographs were taken shortly after the victim left the defendant's care, "he tried to explain them as best he could." The defendant provided Ms. Miller with a written statement of his account of the incident. Ms. Miller checked the defendant's daughter for injuries and found only a bite mark on her shoulder where the victim had bitten her but "didn't see any other bruises."

On cross-examination, Ms. Miller testified that the defendant explained the bruising on the victim's arm by saying that he "picked her up by the arm."

Crystal McKiddy, the former clinic coordinator and a physician assistant at Fast Pace Urgent Care in Oneida, testified that she "was in charge of the daily functions of the office and all of the staff" at the clinic. Ms. McKiddy explained that the clinic's medical records identify the person who "is telling the actual story or chief complaint" of the patient as the "historian" and said that the victim's records of her visit on December 7, 2018, at 10:00 a.m. identify the historian as "'Mother.'" Ms. McKiddy examined the victim at that visit for "cough and congestion," performing an ear, nose, and throat examination, and checking the victim's ear canals. She said that she saw "no visible bruising" during the examination but noted that she did not look behind the victim's ear, explaining that during an ear, nose, and throat examination, she would not necessarily notice bruising "behind the ear or on the scalp because you do not actually take and pull the ear out," rather, "we have to actually pull the ear downward and back toward the scalp" to "stick the otoscope into the opening." She also explained that with child patients, she sometimes had to "have somebody to hold them, and it depends on the position of the child at the time" whether she would notice the sort of bruising that was visible in the photographs of the victim. She said that had she seen bruising, she would have documented it. When shown a photograph of the bruising on the victim's forehead and eye, Ms. McKiddy said that "[u]nless someone was helping to actually hold her head" during the examination, "I would have noticed some part of" the bruising.

During cross-examination, Ms. McKiddy said that several days after she examined the victim, she saw photographs of the victim's injuries on Facebook and that she did not see any of that bruising during the examination. She acknowledged that she also did not see the bruising to the victim's forehead or eye during the examination.

On redirect examination, Ms. McKiddy said that none of the victim's bruises were "visible at the time" of her examination and reiterated that sometimes "it depends on the position of the hands and the holding of the head at the time."

Doctor Mary Palmer, a doctor at Children's Hospital, testified as an expert in child abuse pediatric medicine. She also served on the peer review committee at the hospital, in which role she reviewed cases that resulted in reports of maltreatment of a child to ensure that "the care that's delivered to the child and the family . . . [has] met as many of those needs as we can ascertain." As part of the peer review committee, Doctor Palmer reviewed the victim's medical records. The victim "was seen in the emergency department at Children's Hospital" at 11:06 p.m. on December 7, 2018, by Doctor Mary Costello. The victim's records indicated that the victim's mother and grandmother brought her to the emergency room upon the recommendation of DCS after the mother noticed bruising on the victim following a two-night stay with the defendant. As part of the physical examination, Doctor Costello "ordered particular labs and x-rays and also did photo documentation." The victim's laboratory tests were "normal" and showed no indication that the victim was "bruising more easily."

The victim's records indicated that the victim had a "pattern bruise" on her left forehead, bruising "around . . . and underneath her left eye," "extensive" bruising to the "pinna" and "helix" of her left ear, a "yellow fading bruise" on her right ear, a bruise on her right shoulder, two bruises on her inner right forearm, a bruise on her "outside left shoulder," "[f]our circular bruises" to her inner "left forearm in a linear pattern," a bruise on "the outside chest wall," a bruise on her left flank, a "linear abrasion to [her] right flank," "[y]ellowish fading" bruising to her lower back, "[e]xtensive bruising" and "tiny pinpoint bruises" on her left buttock, and a bruise on her left hip. Doctor Palmer agreed with Doctor Costello's diagnosis that the victim had suffered "[p]hysical abuse." She explained that the physical findings, documentation, and photographs of the victim's injuries "coupled with the lack of credible history that would explain those" injuries "would make that most commonly consistent with physical abuse."

Doctor Palmer said that the bruising to the victim's forehead and eye alone "would be equivocal because kids fall on their faces a lot." She explained that the "severe" and "extensive bruising" to the victim's left ear, however, is "[m]ost commonly . . . caused by something directly hitting on the ear" and that "[i]t's a little uncommon for children to get this extensive bruising by falling on something because it really has to smush the entire ear to get that much bruising through there." Doctor Palmer said that, in her experience, such bruising to an ear "most commonly, it's from something hitting against the head but most commonly, the child being hit in the head with something like a hand that can mold itself around the ear and press the ear into the skull." Based on the "bruising that you see across" the victim's "whole ear," Doctor Palmer determined that "most likely the entire ear, or the entire upper portion of the ear was impacted and hit" with "more significant force because it's forced blood out of the blood vessels into the skin." Although the bruising on the victim's right ear was "more faded than the other side," Doctor Palmer

described the bruising as "severe" and said that it was caused by "where the ear has impacted against the skull, so the force actually injured the blood vessels on the skull . . . as well as into the ear itself," which bruising she said would have required "a pretty significant amount" of force. She said that although it was difficult to quantify the amount of force used, "it wouldn't be a casual bump. It would be a pretty significant impact to the head." She said that the area of bruising on the victim's ears was "a very uncommon area of bruising in children" and would not likely result from the victim's falling "from a standing position onto the ground" or tripping while running. She added, "I can't imagine an accidental history that would cause this kind of bruising." She also opined that the bruising to the victim's ears occurred at different times because the bruises on the right ear were more faded than those on the left. She said that it was not possible for the victim to have received the bruises to her forehead, eye, and ears in a single impact.

Doctor Palmer described the bruising to the victim's shoulder as "kind of a line of bruising" and noted that "[c]hildren don't typically fall on their shoulders to sustain more linear bruises." She explained that when children fall, the most commonly injured areas are "the forehead," "the lower legs, occasionally the arms," and "the chin" and that children do not commonly bruise or injure their shoulders in a fall. Doctor Palmer said that the bruising on the victim's left arm "look[ed] almost like a pinch area . . . . So, I think the skin was kind of grabbed and pinched in that area." She said that the bruise could have been caused by a person lifting the child by the arm but said, "You'd be using a lot of force, . . . and it would be an odd way to lift a child." On the victim's left forearm, the victim had bruising that "looks like the imprint of a thumb or a finger," which bruising Doctor Palmer said was "not at all uncommon," explaining, "Anyone who's had a child that tends to run away from them might have an experience of having grabbed their kid's arm and later on realized that there's a fingerprint bruise where you've grabbed them, and you just pressed hard enough to cause bruising." She noted, however, that the bruising that "looks like fingerprints or finger marks" was inconsistent with an accidental fall.

Doctor Palmer said that the victim had "a really significant deep bruise" to her left chest wall, an area that does not "bruise[] very easily or commonly, and it would have [required] a significant amount of force to force that much blood into that area." She said this sort of bruising does "[n]ot commonly" occur from an accidental fall. The victim's skeletal scan—"an x-ray of every bone in your body"—was "normal excepting . . . a benign little defect in the bone," but Doctor Palmer said that rib fractures "typically aren't visible on an x-ray until seven to [10] days."

Doctor Palmer said that the two-centimeter bruise to the victim's left flank— "the side of the lower thorax, so your upper body but on the bottom portions of it extending down towards the buttock"—was an injury "[n]ot typically" sustained in an accidental fall unless the victim fell on the "bony prominences" of the hip. The linear abrasion to the

victim's right flank indicated to Doctor Palmer that "something was drug across her skin or she drug herself across something sharp." The victim also had bruising in the middle of her lower back, which injury Doctor Palmer said could not have been sustained in the same fall as the injuries to the victim's right and left flanks.

Doctor Palmer said that the petechiae to the victim's upper left buttock was a type of bruising that "involves those little broken blood vessels." Because the buttocks have "a lot more fatty tissue protecting the deeper blood vessels . . . [,] it tends to take a little bit more force" to cause a bruise. She said that the area of the victim's buttocks that was bruised was not the area that would be impacted in an accidental fall, noting, "[i]t's almost the lower back really that's impacted here much more than the buttock itself. And children fall on the area below that, the fattier tissues." She also said that "[i]n order to cause those different areas of bruises, there was more than one impact to the buttock." She determined that the bruising pattern could have been caused by a hand or an object but that it could not have resulted from an accidental fall. On the victim's "outside left hip," she had "two small areas of bruising" that Doctor Palmer determined could not have been caused in the same impact as the injuries to the victim's flanks and buttocks.

Doctor Palmer reiterated that the victim's injuries could not have been sustained in one or two falls, by having the defendant's daughter fall on top of her, or by falling on top of a toy. She described the bruising over the victim's body as "severe" and said that she believed "these bruises were inflicted upon" the victim and that "she was hit about both sides of the head, and she was grabbed forcefully multiple times." She opined that the victim would have felt pain with these injuries and that because "[t]he head has the most amounts of sensors," "being hit on your ear is really painful." She also said that "you can rupture the eardrum from a blow on the ear" and that "depending on the movement of the body or the amount of force that's impacted against the head, you could cause injury to the brain."

During cross-examination, Doctor Palmer acknowledged that she did not examine the victim. She also acknowledged that the victim's medical records from Children's Hospital indicated that the victim showed "no acute signs of distress" and "did not complain of pain" in her ears or report any other pain during the examination. She acknowledged that the victim did not have an abrasion to her right flank in the photograph of the victim's back taken by Officer Russell on December 7, 2018, before the victim came to the hospital. She said that it was possible to bruise an ear by pulling and tugging on it with enough force.

Doctor Palmer clarified that the bruising on the victim's left arm that resembled finger marks was on her upper arm and that the medical records incorrectly identified it as the victim's forearm. She acknowledged that the finger mark bruises could

have been caused by someone picking up the victim by her arm but reiterated, "It's a lot of force to cause that." She said that the petechia bruising on the victim's buttock could have been caused by something with a pattern, "like a hairbrush or something that has very small areas" but that "you could get this pattern without have a patterned instrument hitting it."

Doctor Palmer acknowledged that she had seen instances of children sustaining excessive bruising from being pushed into things but said that because children "don't have a lot of body mass[,] . . . it's hard to cause excessive bruising by their own falling." Because most of the victim's bruises were "kind of a bright purple" color, Doctor Palmer said that "it's reasonable to accept that they [we]re within two days old" when the victim was examined at the hospital. She acknowledged, however, that she could not determine the age of a bruise.

The State rested. The defendant elected not to testify and did not put on proof. The State dismissed Count 2, aggravated child abuse by use of a deadly weapon, and the jury considered only a single count of aggravated child abuse.

The jury found the defendant guilty of one count of aggravated child abuse. After a sentencing hearing, the trial court sentenced the defendant as a Range I offender to 16 years' incarceration. Following a timely but unsuccessful motion for new trial and amended motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant asserts that certain comments by the victim deprived him of an impartial jury, that the trial court erred by failing to excuse a juror for cause, that Doctor Palmer gave improper expert testimony, and that the evidence was insufficient to support his conviction. We consider each claim in turn.

## I. Impartial Jury

The defendant challenges the impartiality of the jury on two grounds. First, he argues that the jury was exposed to extraneous prejudicial information or improper outside influence when the victim made unsolicited statements. Next, he contends that the trial court erred by failing to remove a potential juror for cause after the potential juror identified herself as being the aunt of the victim's mother and the great aunt of the victim.

"Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a trial by an 'impartial jury.'" *State v. Hugueley*, 185 S.W.3d 356, 377 (Tenn. 2006) (citing U.S. Const. amend. VI; Tenn. Const. art. I, § 9). Our supreme court has defined an "unbiased and impartial jury" as "one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *Smith*, 418 S.W. 3d at 45 (citing *Durham v. State*, 188 S.W.2d 555, 558 (Tenn. 1945); *State v. Adams*, 405 S.W.3d 641,

650-51 (Tenn. 2013)). "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)).

The defendant argues that he was prejudiced by statements the victim made during jury voir dire and while being sworn as a witness. The State argues that the defendant has waived the issue for failure to object to the victim's statements at trial and that the defendant is not entitled to plain error review.

During jury voir dire, the trial court had the four-year-old victim come to counsel's table so that the potential jurors could determine whether they recognized her. While the victim was in the courtroom, the prosecutor asked the victim, "Now, you want to wave to the people? Is that pretty cool? Anything you want to say?" The court thanked the State for "making her available," and as the victim was excused from the courtroom, she said "Bye." The prosecutor immediately told the victim, "You can't say anything." The defendant did not object to the victim's saying, "Bye" as she left the courtroom.

Later, when the victim was called to testify, the following exchange occurred:

THE COURT: Young lady, I'm gonna swear you in. Has anybody talked to you about that, about raising your right hand and promising to tell the truth?

WITNESS: No.

THE COURT: No one has spoken to you about that? Do you know what that means?

WITNESS: Daddy been mean to me.

After the State voir dired the victim about her understanding of "telling the truth," the following occurred:

THE COURT: Do you solemnly swear to tell the truth in this case?

WITNESS: (Indicating yes).

THE COURT: Okay. You're shaking your head up and

down.  That means yes?

> WITNESS: Yes.

> THE COURT: Okay.  We'll go forward from here.  I --
> we'll let this --

> WITNESS: My dad -- my daddy bruised me on my hip.

After the victim's second unsolicited statement, the prosecutor told her that she would ask questions for the victim to answer, and the victim said that she understood.  The defendant did not object to the victim's unsolicited statements.

We need not tarry long over the defendant's claim that the jury was exposed to extraneous prejudicial information or improper outside influence by the victim's statements.  First, none of the victim's challenged statements constituted improper outside influence because the statements were not private communications with a juror.  *See Adams*, 405 S.W.3d 641, 650-51 (Tenn. 2013) ("An improper outside influence is any unauthorized 'private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.'" (citations omitted)).  Nor do the victim's statements constitute extraneous prejudicial information.  Our supreme court has defined extraneous prejudicial information "broadly . . . as information 'coming from without'" and "[m]ore specifically, . . . [a]s information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Id.* at 650 (citations omitted).  None of the victim's challenged statements arose from outside the trial process.  That the challenged statements were made outside the scope of her testimony does not render them extraneous to the trial.  Moreover, the victim's telling the jury "bye" during voir dire was not a statement of fact or opinion; it was merely a valediction.  The other two statements at issue, the victim's saying, "Daddy been mean to me" and "[M]y daddy bruised me on my hip," although statements of fact, were facts that were ultimately admitted into evidence, and, consequently, do not constitute extraneous information.

The defendant also argues that the trial court should have sua sponte declared a mistrial after the victim made unsolicited statements while she was being sworn as a witness.  "Normally, a mistrial should be declared only if there is a manifest necessity for such action.  In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Saylor*, 117 S.W.3d 239, 250-51 (Tenn. 2003) (citation omitted).  Because the victim's unsolicited statements did not provide the jury with any information not otherwise offered in evidence, the defendant was not prejudiced by the victim's statements, and no miscarriage of justice

-13-

resulted.

Next, the defendant argues that he was deprived of a fair and impartial jury because the trial court failed to strike a potential juror for cause after the potential juror said that the victim's mother was her niece. The State argues that the defendant has failed to establish that he was prejudiced by the court's ruling.

During jury voir dire, a potential juror said that she was the victim's mother's aunt by marriage and that she had known the victim's grandmother for approximately 40 years. She said that she did not know the victim's mother well and that she had not been around her other than when the victim's mother cleaned the room at the nursing home where the potential juror's father lived. The potential juror indicated that her relationship to the victim's grandmother would have no bearing on her decisions as a juror, explaining that she had "never been around" the victim and that before this case, she "didn't even know the [victim's] name." The defendant moved to have the potential juror removed for cause, and the trial court questioned the juror on her ability to be impartial. After the potential juror indicated that she could "render a fair and impartial verdict based solely on the evidence and law," the trial court denied "the cause challenge." The defendant then used a peremptory strike to remove the potential juror from the jury. Although the defendant failed to include the written peremptory strikes in the record on appeal, at the motion for new trial hearing, the trial court found that the defendant exhausted his peremptory strikes, and we presume that finding is correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).

The defendant contends that the potential juror was statutorily disqualified from serving on the jury under Code section 22-1-105, which provides: "No person can act as a juror in any case in which he is interested, or when either of the parties is connected with him by affinity or consanguinity within the sixth degree, computing by the civil law, except by consent of all the parties." T.C.A. § 22-1-105. His reliance on this statute, however, is inapt. The victim, here, was not a party to the case. *See State v. Flood*, 219 S.W.3d 307, 314 (Tenn. 2007) ("[A] victim in a criminal case does not meet the definition of a 'party.'" (citing *City of Chattanooga v. Swift*, 442 S.W.2d 257, 258 (1969)). Consequently, the potential juror was not statutorily disqualified from serving on the jury.

"A trial court has wide discretion in ruling on the qualifications of a juror . . . ." *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993) (citing *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989)). Generally, juror disqualifications are based upon one of two theories: (1) propter defectum—"general disqualifications"—or (2) propter affectum—"disqualifications on account of some bias or partiality toward one side or the other of the litigation." *Partin v. Henderson*, 686 S.W.2d 587, 589 (Tenn. Ct. App. 1984) (citing *Durham v. State*, 188 S.W.2d 555, 557 (Tenn. 1945); *Toombs v. State*, 270 S.W.2d

649, 651 (Tenn. 1954)). Objections based on general disqualifications, such as familial relationship, fall within the propter defectum class and, accordingly, must be challenged prior to the verdict. *Id.* at 589. Although a potential juror's relation to "one of the witnesses may present an opportunity for prejudice, bias will not be presumed and the defendant is not relieved of the burden of presenting facts in addition to mere relationship which would give rise to a showing of actual prejudice." *State v. Hugueley*, 185 S.W.3d 356, 379 (Tenn. 2006) (quoting *Bristow v. State*, 219 A.2d 33, 34 (Md. 1966) and citing *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980)) (concluding that "a half-sibling connection" between a potential juror and a witness was insufficient "to raise a presumption of bias"). As our supreme court has stated, "[M]any ties of kinship do not result in close relationships, and we are therefore unwilling to presume any particular level of bias arising from the familial relationship between [a potential juror] and the State's witness." *Id.*

When a defendant challenges the impartiality of the empaneled jury based on the trial court's failure to strike a potential juror for cause, he must establish that he "exhaust[ed] all of his peremptory challenges and [that] an incompetent juror [wa]s forced upon him." *Howell*, 868 S.W.2d at 248 (citing *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990)). "As long as the jury that sits is impartial, the denial or impairment of the right to exercise peremptory challenges does not violate the Sixth Amendment." *Id.*

In our view, the trial court did not abuse its discretion by declining to remove the potential juror for cause. Although the potential juror was related to the victim, the trial court questioned her about her impartiality, and she confirmed that she could fairly consider the evidence. Moreover, the defendant has failed to present any evidence beyond the potential juror's relationship to the victim to establish that the potential juror harbored bias against him. Even if the trial court erred in allowing the potential juror to remain, the defendant has failed to show that he was forced to have an incompetent or biased juror because he lacked sufficient peremptory strikes, and we will not speculate as to a juror's bias or incompetence. *See Hugueley*, 185 S.W.3d at 380 ("Juror bias must be shown, not just suspected." (quoting *State v. Lawson* 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990))).

## II. Doctor Palmer's Testimony

The defendant argues that the State improperly "touted [Doctor] Palmer as an expert" and that the "will of the jury was overrun with [Doctor Palmer's] opinion" that the victim's bruising was severe. The State contends that Doctor Palmer was competent to testify as an expert and that she properly offered her expert opinion on the victim's injuries.

The admissibility of expert testimony is governed by Rules 702 and 703 of

the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

At trial, the defendant stipulated to Doctor Palmer's qualification as an expert, and on appeal, he does not challenge the trial court's certifying her as an expert in child abuse; he takes issue with the State's repeatedly "touting" her as an expert in the field. The trial court, however, certified Doctor Palmer as an expert in the field of child abuse pediatric medicine—without objection by the defendant—and the State committed no error by identifying her as such. The State's emphasizing the doctor's credentials and expertise was not improper bolstering of the witness. The defendant asserts that because the State "touted D[octor] Palmer as an expert in the field of child abuse[,] if she said it then it had to be fact." The trial court, however, instructed the jury that they were not "bound to accept" Doctor Palmer's opinion "[m]erely because [she was] an expert witness," and we must presume that the jury followed that instruction and did not place any inappropriate weight on Doctor Palmer's testimony. *See State v. Woods*, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990) (the jury is presumed to follow the instructions given it by the trial court).

The defendant also argues that the trial court erred by permitting Doctor Palmer to testify that the victim's bruises were severe because the severity of the victim's injuries was to be determined by the jury. Our supreme court, however has "expressly rejected the idea that expert testimony is inadmissible because it goes to an ultimate issue in the case." *State v. Furlough*, 797 S.W.2d 631, 651 (Tenn. 1990) (citing *City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d 734 (Tenn. 1977)). "[T]he better rule is that an expert's opinion is not objectionable merely because it embraces an ultimate issue to be decided by the trier of facts, so long as it is helpful to the court." *Id.* (quoting *C.F.W. Constr. Co.*, 557 S.W.2d at 742) (alteration in original). Based on her certification as an expert in child abuse pediatric medicine, Doctor Palmer was qualified to offer her opinion on the severity of the victim's bruises, and her opinion that the victim's bruises were severe did not invade

-16-

the purview of the jury.  *See id.* (concluding that "[b]ecause [the witness] qualified as an expert, it was error to prevent her from answering merely because it embraced the ultimate issue").

### III.  Sufficiency of the Evidence

Finally, the defendant contends that the State failed to present sufficient evidence to support his conviction of aggravated child abuse.  Specifically, the defendant argues that Doctor Palmer "over exaggerated" the victim's injuries and that the victim's testimony was inconsistent.  The State argues that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).  This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact.  *Dorantes*, 331 S.W.3d at 379.  The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  *Id.*

As charged in this case, "[a] person commits the offense of aggravated child abuse . . . , who commits child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child."  T.C.A. § 39-15-402(a)(1)-(2).  A person commits child abuse by "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such a manner as to inflict injury."  *Id.* § 39-15-401(a).  "'Serious bodily injury to the child' includes, but is not limited to, . . . injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects . . . ."  *Id.* § 39-15-402(c).  When committed against a child eight years of age or less, the offense of aggravated child abuse is a Class A felony.  *Id.* § 39-15-402(b).

The evidence adduced at trial, considered in the light most favorable to the State, established that when the victim was three years old and in the care of the defendant, she sustained significant bruising to her head, face, ears, arms, chest, hip, flanks, back, and buttocks.  The victim's testimony established that the defendant "punched" her in the eye, "hurt" her, "squeezed [her] arm," and threw her against the bars of a bed.  Doctor Palmer's testimony established that most of the victim's injuries could not have resulted from an

accidental fall and that they were consistent with her having been hit on both sides of her head and "grabbed forcefully multiple times." Doctor Palmer also described several of the victim's bruises as "severe." Numerous photographs showed the extent of the victim's injuries, including dark blue and purple bruises across the victim's body. The victim's medical records from Children's Hospital documented each bruise and indicated that they were caused by "[p]hysical abuse." On these facts, a rational trier of fact could have found beyond a reasonable doubt that the defendant knowingly treated the victim in such a way as to cause her injuries and that the victim's bruises were severe.

*Conclusion*

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE